May 24, 2019

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION
MDGA CASE NUMBER 1:19-MJ-41
WIE CRIMINAL NO. 2019-CR-96

---

THE UNITED STATES OF AMERICA )
                             )        MAY 24, 2019
vs.                          )
                             )        ALBANY, GEORGIA
                             )
SAUL GARCIA, SAUL GARCIA, JR., )
DANIEL GARCIA, CONSUELO GARCIA,)
and MARIA REMEDIOS           )
GARCIA-OLALDE,               )
                             )
            DEFENDANTS       )

---

DETENTION HEARING
BEFORE THE HONORABLE THOMAS Q. LANGSTAFF
UNITED STATES MAGISTRATE COURT JUDGE

APPEARANCES:

FOR THE GOVERNMENT              JAMES CRANE, AUSA
                                UNITED STATES ATTORNEY'S OFFICE
                                C.B. KING UNITED STATES COURTHOUSE
                                201 WEST BROAD AVENUE
                                ALBANY, GEORGIA  31701

FOR DEFENDANTS                  IVY NEAL CADLE, ESQ.
SAUL GARCIA,                    BAKER DONELSON
SAUL GARCIA, JR., and           300 MULBERRY STREET, SUITE 201
DANIEL GARCIA                   MACON, GEORGIA  31204

FOR DEFENDANT                   RICK COLLUM, ESQ.
CONSUELO GARCIA                 THE COLLUM LAW FIRM
                                P.O. BOX 1867
                                MOULTRIE, GEORGIA  31776

FOR DEFENDANT                   NICOLE WILLIAMS, ESQ.
MARIA REMEDIOS GARCIA-OLALDE    345 W. BROAD AVENUE, SUITE 305
                                ALBANY, GEORGIA  31701

JULISSA CLAPP, INTERPRETER

MINDY MARTIN, TRANSCRIBER

May 24, 2019

<u>I N D E X</u>

PAGE

PRELIMINARY MATTERS                                            4

WITNESSES FOR DEFENDANTS

JAMES GIBBS PATRICK III
    Direct Examination by Mr. Cadle                          15
    Direct Examination by Mr. Collum                         21
    Cross Examination by Mr. Crane                           24
    Redirect Examination by Mr. Collum                       27

BRENT BLOZIER
    Direct Examination by Mr. Cadle                          29
    Direct Examination by Mr. Collum                         35
    Direct Examination by Ms. Williams                       35
    Cross Examination by Mr. Crane                           38
    Redirect Examination by Mr. Collum                       43
    Recross Examination by Mr. Crane                         44

MARTY MILLER
    Direct Examination by Mr. Cadle                          46
    Direct Examination by Mr. Collum                         53
    Cross Examination by Mr. Crane                           55

CASEY NEWBERRY
    Direct Examination by Mr. Cadle                          59
    Direct Examination by Mr. Collum                         62
    Direct Examination by Ms. Williams                       63
    Cross Examination by Mr. Crane                           66

REBECCA ALICE CLARK
    Direct Examination by Mr. Cadle                          71
    Direct Examination by Mr. Collum                         73

PROFFER BY MR. CADLE                                          75

Index continues

Case 2:19-cr-00096-PP    Filed 06/24/19    Page 2 of 121    Document 11
229-405-6818

May 24, 2019

JUDY BURNHAM
    Direct Examination by Mr. Collum                77
    Cross Examination by Mr. Crane                  80

MICHAEL PARTON
    Direct Examination by Mr. Collum                82

PROFFER BY MR. COLLUM                               84

KELLY NAOMI TORRES
    Direct Examination by Ms. Williams              85
    Cross Examination by Mr. Crane                  88

ROSITA SENASEROS
    Direct Examination by Ms. Williams              90

ARGUMENT BY MR. CADLE                               94
ARGUMENT BY MR. COLLUM                              95
ARGUMENT BY MS. WILLIAMS                            96
ARGUMENT BY MR. CRANE                              100

EXHIBITS

FOR THE GOVERNMENT

1       Department of Homeland Security document
        Received                                    11

2       Proffer document at docket entry number 23
        Received                                    13

FOR DEFENDANTS SAUL GARCIA, SR., SAUL GARCIA, JR., AND
DANIEL GARCIA

1       Letter from Tim Moore of Moore Farms
        Received                                    76

CERTIFICATE OF REPORTER                            121

May 24, 2019

1    (Commences at 9:30 a.m.)

2         THE COURT:  All right.  Good morning to everyone.

3    (Counsel reply)

4         THE COURT:  It is 9:30 a.m. on Friday, May 24.  We've

5    got one case and five defendants scheduled for a detention

6    hearing this morning.

7    (Pause)

8         THE COURT:  For the government, Mr. Crane appears.  For

9    Consuelo Garcia, Mr. Collum appears.  For Maria Garcia-Olalde,

10   Ms. Williams -- where's -- Ms. Williams appears right in front

11   of me.  All right.  And for the other three defendants, Daniel

12   Garcia, Saul Garcia, Sr., and Saul Garcia, Jr., Mr. Cadle

13   appears?

14        MR. CADLE:  Yes, your Honor, Ivy Cadle.

15        THE COURT:  Good morning, Mr. Cadle.

16        MR. CADLE:  Good morning, Judge.

17        THE COURT:  Mr. Cadle, the Court notes your entry of

18   appearance for the three defendants that I mentioned.  Under

19   Rule 44(c), the Court is required in the case of joint

20   representation to inquire about the propriety of such

21   representation to make sure there's no conflict, at least for

22   purposes of this detention hearing and for other purposes.  So

23   could you speak to that initially?

24        MR. CADLE:  Yes, your Honor.  Initially, I would

25   represent to the Court that these three gentlemen are all in a

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 18 of 121   Document 11
229-405-6618

May 24, 2019

 1   family business.  They're all citizens of the community.  They
 2   all work with each other.  They all have common witnesses who I
 3   understand will appear here and say similar things on their
 4   behalf.

 5       I have talked to each of them about any potential conflict
 6   of interest and any potential divergence that may appear, which,
 7   frankly, to me, appear to be none.  And they have all agreed to
 8   waive any potential conflicts as it relates to this proceeding
 9   today.  They have all been advised that they need to retain
10   independent counsel or at least make that consideration as this
11   proceeding moves forward.

12       THE COURT:  All right.  Have you obtained verbal
13   waivers or written waivers?

14       MR. CADLE:  They're verbal waivers, your Honor.

15       THE COURT:  All right.  Thank you, Mr. Cadle.

16       MR. CADLE:  Yes, your Honor.

17       THE COURT:  I think under Rule 44, the Court is
18   required itself to personally advise each defendant, though I
19   certainly understand your representation and the Court accepts
20   that.

21       Mr. Daniel Garcia.

22       DEFENDANT DANIEL GARCIA:  Yes, sir.

23       THE COURT:  Under the rules, I want to -- I know your
24   lawyer has done this, but I want to personally advise you of
25   your right to effective assistance of counsel, including

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 5 of 121   Document 11

May 24, 2019

1  separate representation.  Are you aware that you're entitled to

2  a separate lawyer?

3          DEFENDANT DANIEL GARCIA:  Yes, sir.

4          THE COURT:  And are you willing to have Mr. Cadle for

5  purposes of this detention hearing this morning represent you

6  and Mr. Saul Garcia, Sr., and Saul Garcia, Jr.?

7          DEFENDANT DANIEL GARCIA:  Yes, sir.

8          THE COURT:  All right.  Thank you, sir.

9      And Mr. Saul Garcia, Sr., are you aware of your right to

10  have effective assistance of counsel, including separate

11  representation for this hearing this morning?

12          DEFENDANT SAUL GARCIA, SR.:  Yes, sir.

13          THE COURT:  And you understand that the lawyer who's

14  appearing for you is also representing Daniel Garcia and Saul

15  Garcia, Jr.?

16          DEFENDANT SAUL GARCIA, SR.:  Yes, sir.

17          THE COURT:  And you want him to represent you for

18  purposes of this detention hearing as well this morning.

19          DEFENDANT SAUL GARCIA, SR.:  Yes, sir.

20          THE COURT:  All right.  Thank you, sir.

21      And Mr. Saul Garcia, Jr., are you aware of your right to

22  effective assistance of counsel, including separate

23  representation for this detention hearing this morning?

24          DEFENDANT SAUL GARCIA, JR.:  Yes, sir.

25          THE COURT:  And you're aware that Mr. Cadle is

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 6 of 121   Document 11
229-405-6818

May 24, 2019

 1    representing Saul Garcia, Sr., and Daniel Garcia in this matter.

 2             DEFENDANT SAUL GARCIA, JR.:  Yes, sir.

 3             THE COURT:  But you want him to represent you as well

 4    in this detention hearing.

 5             DEFENDANT SAUL GARCIA, JR.:  Yes, sir.

 6             THE COURT:  All right.  Thank you, sir.

 7        Mr. Crane, does the government have any objection to the

 8    Court going forward in the joint representation for purpose of

 9    the detention hearing this morning?

10             MR. CRANE:  No, your Honor.

11             THE COURT:  All right.

12             MR. CADLE:  Your Honor, we have a number of witnesses.

13    Is there any objection to all the witnesses remaining in the

14    courtroom throughout the proceedings, or does the government

15    want the rule invoked?

16             THE COURT:  Mr. Crane?

17             MR. CRANE:  Yes, I would invoke the rule.

18             THE COURT:  All right.  So I'll ask all counsel,

19    government, defense attorneys, if there's anyone that you expect

20    might testify this morning, please ask them to wait outside.

21    Just outside the courtroom, that is.

22        (Pause while attorneys direct potential witnesses to exit

23    courtroom)

24             MR. CADLE:  I believe that's it, your Honor.

25        (Pause while attorneys direct potential witnesses to exit

May 24, 2019

1  courtroom)

2        MR. CADLE:  All right.  They're outside, your Honor.

3        THE COURT:  All right.  Very good.

4     Ms. Clapp, don't worry, I haven't forgotten about you.  But

5  I almost did.

6     Mr. Lawrence, if you will swear our interpreter, please.

7     (Interpreter sworn)

8        THE COURT:  And of course the Court is proceeding with

9  the understanding that only Ms. Maria Garcia-Olalde is in need

10  of an interpreter.  Is that correct, Mr. Collum?

11        MR. COLLUM:  That is correct, your Honor.

12        THE COURT:  And Mr. Cadle?

13        MR. CADLE:  Yes, your Honor.

14        THE COURT:  All right.  Let's see.  The government has

15  filed a motion where they invoke the rebuttable presumption.

16  The Court has looked at it.  It appears the rebuttal presumption

17  is in play.

18     Ms. Williams, do you agree?

19        MS. WILLIAMS:  I do, your Honor.

20        THE COURT:  Mr. Collum?

21        MR. COLLUM:  I agree.

22        THE COURT:  And Mr. Cadle?

23        MR. CADLE:  Yes, your Honor.

24        THE COURT:  All right.  Now, procedurally, let me just

25  refresh counsel that of course the Court will hear evidence

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 8 of 121   Document 11

May 24, 2019

1  presented by everyone.  The government has the burden so we'll
2  start with the government.

3      The Court typically allows parties to proceed by proffer in
4  these matters.  Keep in mind that whether you proceed by proffer
5  or call witnesses or some combination, that the Court will
6  review the five pretrial services reports that have been
7  prepared in the case, which I have and all counsel should have.
8  So no reason to belabor the information contained in those
9  reports.

10      In other words, I'm going to review all that.  You're
11  certainly welcome to point out to me in closing what you think
12  is key or significant in those reports.  And of course if you
13  disagree with anything in the reports, you're welcome to bring
14  that out in the evidence.

15      After the evidence is closed, I will give each counsel an
16  opportunity to give the Court a summation, and that would be an
17  appropriate time to bring out anything you want to to emphasize
18  in the Pretrial Services Report.

19      All right.  I think that's the preliminaries.  So,
20  Mr. Crane, you have the burden in representing the government.
21  I do -- I'm sorry, Mr. Cadle.

22      MR. CADLE:  I'm sorry your Honor.  I don't mean to
23  interrupt.  I was only provided pretrial services reports for
24  Mr. Garcia, Sr., and Daniel Garcia.  I do not have one for Jr.
25      (Pause)

Case 2:19-cr-00096-PP   Filed 06/24/19   Page 9 of 121   Document 11

May 24, 2019

1          MR. CADLE:  I have it now, your Honor.

2          THE COURT:  All right.  Thank you, Mr. Howell.

3      All right.  So, Mr. Crane, the Court is aware that the

4   government has filed a rather lengthy proffer.  How does the

5   government want to proceed?  Are you proceeding by proffer,

6   calling witnesses, or both?

7          MR. CRANE:  Proceeding by proffer, your Honor.

8          THE COURT:  All right.  Is there going to be anything

9   other than what's in those 18 pages?

10         MR. CRANE:  Yes, one exhibit, which I've given to

11  counsel and will tender to the clerk and the Court.

12         THE COURT:  All right.  Defense counsel has seen it?

13         MR. CRANE:  Yes.

14         THE COURT:  Any objection, Mr. Collum, to what

15  Mr. Crane -- what, is it marked as Government's Exhibit 1?

16         MR. CRANE:  I will mark it as Government's Exhibit 1.

17         MR. COLLUM:  Your Honor, we received a two-page

18  document this morning from Mr. Crane, but there's an 18-page

19  document?

20         THE COURT:  It was filed on the docket, I think,

21  yesterday.

22         MR. COLLUM:  I haven't -- I checked my emails this

23  morning, and there was no notification as to it.

24         THE COURT:  All right.  Well, we'll deal with that.  I

25  appreciate that, but --

Case 2:19-cr-00096-PP   Filed 06/04/24   Page 10 of 121   Document 11

1          MR. COLLUM:  I just haven't seen it.

2          THE COURT:  I understand.

3      Describe this exhibit that you're tendering, Mr. Crane.

4          MR. CRANE:  Yes.  It's a document that Homeland

5  Security has compiled which has the exit and entry into and out

6  of the United States by all five defendants.

7          THE COURT:  All right.  Are those entries and exits by

8  legal means or otherwise?

9          MR. CRANE:  Yes, by legal means.

10          THE COURT:  All right.  Let's see.  We ought to

11  establish some kind of order for the purpose of the detention

12  hearing.  So I'm inclined to follow the order that's on the

13  Court's calendar.

14      So that means, Mr. Cadle, I'll start with you.  Any

15  objection to Government's Exhibit Number 1 on behalf of the

16  three Garcias you're representing?

17          MR. CADLE:  None, your Honor.

18          THE COURT:  And Mr. Collum for Consuelo Garcia.

19          MR. COLLUM:  No, your Honor.

20          THE COURT:  And Ms. Williams for Ms. Garcia-Olalde.

21          MS. WILLIAMS:  No objection.

22          THE COURT:  All right.  So Government's Exhibit 1 is

23  admitted, and you can tender that, Mr. Crane.

24          MR. CRANE:  Very well.

25      (Government's Exhibit No. 1 received in evidence)

May 24, 2019

1        THE COURT:  And what else has the government by the way

2   of proffer?

3        MR. CRANE:  Other than the pleading, which was filed on

4   the docket, I will just summarize the lengthy submission.  I can

5   do that now, or I can do that in closing, as the Court please.

6        THE COURT:  All right.  Thank you, Mr. Crane.  So we

7   need to give the lawyers an opportunity -- have you got a copy

8   of -- Mr. Cadle, have you seen it, the 18 --

9        MR. CADLE:  Yes, your Honor.

10       THE COURT:  Ms. Williams, have you got it?

11       MS. WILLIAMS:  I have it, your Honor.

12       THE COURT:  All right.  So we need to get it to

13  Mr. Collum.

14       MR. COLLUM:  Your Honor, I'm reviewing it now.  And I'm

15  fine with it, your Honor.  I've got it.  I've been able to look

16  over it.  They just, they gave me a copy.

17       THE COURT:  All right.  So I know you filed it on the

18  docket, Mr. Crane, but I think, separately, if you want the

19  Court to consider it as part of this detention hearing, you

20  probably want to move to admit that 18-page proffer?

21       MR. CRANE:  Very well.  I so move to admit.  And it was

22  labeled by ECF as document number 23 on the docket, consisting

23  of 18 pages.

24       THE COURT:  All right.  Mr. Cadle, any objection to the

25  Court's consideration of that 18-page proffer on the docket?

May 24, 2019

1        MR. COLLUM:  No, your Honor.

2        THE COURT:  Ms. Williams?

3        MS. WILLIAMS:  No, your Honor.

4        THE COURT:  And, Mr. Collum, I don't want to rush you.

5   I'll give you -- you go ahead and go through it if you'd like.

6        MR. COLLUM:  No, there's no objection, your Honor.

7        THE COURT:  All right.  So, Mr. Crane, I don't want to

8   cut the government short, but I will consider the 18-page

9   proffer and give you an opportunity in closing to point out

10  anything you think is particularly relevant in that 18 pages to

11  focus on.  So with that, with document 23, the Court will

12  consider, along with Government's 1.

13      (Government's Exhibit No. 2 received in evidence)

14      THE COURT:  Anything else from the government?

15      MR. CRANE:  No, your Honor.

16      THE COURT:  All right.  So now we move to the

17  defendants and any evidence they want to present.

18      Mr. Cadle, we will start with you on behalf of Daniel

19  Garcia, Saul Garcia, Sr., and Saul Garcia, Jr.  Any evidence or

20  proffer on their behalf?

21      MR. CADLE:  Your Honor, I have witnesses that I would

22  like to call.  And I can give a short recitation of what I know

23  about the defendants that I hope is not duplicitous of what is

24  in the reports.

25      THE COURT:  All right.  Well, let's -- you present it

May 24, 2019

1   like you want to.  I'd rather it not be duplicative of the

2   witness testimony.  Do you want to do the witnesses first and

3   then fill in the gaps?

4           MR. CADLE:  That's fine.

5           THE COURT:  All right.  Then you may call your first

6   witness.

7           MR. CADLE:  Yes, your Honor.  Jamie Patrick.

8           MR. COLLUM:  Your Honor?

9           THE COURT:  Yes, sir?

10          MR. COLLUM:  As some of the witnesses will be utilized

11  for more than one defendant, for time's sake, once Mr. Cadle is

12  finished, then we can proceed with the appropriate defendant

13  related to this witness, correct?

14          THE COURT:  Thank you, Mr. Collum.  Yes.

15          MR. COLLUM:  All right.

16          THE COURT:  And if I forget to ask that question, don't

17  hesitate to point it out.  But, yes, that sounds like a good way

18  to proceed.

19          THE COURTROOM DEPUTY:  Raise your right hand.

20          THE WITNESS, JAMES GIBBS PATRICK III, IS SWORN

21          THE COURT:  Good morning, sir.

22          THE WITNESS:  Good morning.

23          THE COURT:  You may sit down.  And you may want to

24  adjust that microphone a little bit or --

25          THE WITNESS:  No, it's fine.

May 24, 2019

1        THE COURT:  All right.  Mr. Cadle, you may proceed.

2                    DIRECT EXAMINATION

3    BY MR. CADLE:

4    Q.  Could you state your name for the record, please.

5    A.  James Gibbs Patrick III.

6    Q.  Okay.  And, Mr. Patrick, what do you do?

7    A.  I am a farmer.

8    Q.  Okay.  Where at?

9    A.  In Omega, Georgia.

10   Q.  And what's the name of your farm?

11   A.  Patrick Family Farms, LLC.

12   Q.  Can you tell us about Patrick Family Farms, LLC?

13   A.  Yes, sir.  We're a produce farm.  I'm a fourth generation

14   farmer.  We farm broccoli, watermelons, greens, sweetcorn.

15   Q.  Where are you at in the farming cycle right now?

16   A.  Oh.  Right now we're in the middle -- we're at the beginning

17   of our season.  We just started off harvesting sweetcorn.  We're

18   still harvesting greens.  We're harvesting broccoli.  We're very

19   busy right now.

20   Q.  Okay.  Do you know Mr. Saul Garcia, Sr.?

21   A.  Yes, I do.

22   Q.  Okay.  And have you -- fourth generation, lived here all

23   your life, that kind of thing, right?

24   A.  Yes, sir, my whole life.  Yes, sir.

25   Q.  How do you know Mr. Saul Garcia, Sr.?

Case 2:19-cr-00096-PP   Filed 06/020 945 Pa3g4e0 51 6815 of 121   Document 11

May 24, 2019

1  A.  We hired Mr. Saul Garcia, Sr., to harvest our crops in 2004.

2  And so I've known him for about 15 years.

3  Q.  And has he been helping harvest crops continuously since

4  2004?

5  A.  Yes, sir, he has.

6  Q.  Okay.  And is he -- what's your relation?  Is he a

7  subcontractor for the family farm?

8  A.  Yes, sir, he's a subcontractor for the family farm.  And

9  then over the years, he's become a family friend.

10  Q.  When you say he harvests crops, him personally or how --

11  A.  His employees.  So he manages the employees, and the

12  employees harvest the crops for us.

13  Q.  About how many employees?

14  A.  His employees, I believe on our farm he has, it's a few over

15  a hundred.  In fact, 136 I believe is the actual number.

16  Q.  You said over 14 -- or over 15 years.  Have you had an

17  opportunity to observe his interactions with the community?

18  A.  Yes, sir.  He's an upstanding gentleman in our community.

19  Q.  Does he generally appear and is he reliable?

20  A.  Yes, he's very reliable.  He's always on time.  He's always

21  there.  When we need him, he's always there.

22  Q.  Is he trustworthy?

23  A.  Yes, very trustworthy.

24  Q.  Have you ever had any problems with him missing important --

25  A.  Never.  Anytime he comes in and we say what we're going to

May 24, 2019

1   do -- I don't even have a contract with Mr. Garcia.  What we do

2   is verbally.  He does everything that he needs for us.

3   Q.  And do you have any reason to believe that he would be a

4   danger to the community?

5   A.  Definitely not.

6   Q.  Do you have any reason to know that he's had any run-ins

7   with law enforcement?

8   A.  No.

9   Q.  Okay.  Do you have any reason to think he would harm anyone?

10  A.  No, he would not.

11  Q.  What are his family ties to this area?

12  A.  He has very strong ties to this area.  Being here over 15

13  years, you know, just helping out in the community, other

14  children that need -- there at the school, we're right next to

15  Omega Elementary School, and helping children there.  He's very,

16  very helpful in the community.

17  Q.  Based on what you've observed, what do you know about his

18  physical or mental condition?

19  A.  Oh, it's fine.

20  Q.  How would you describe his character?

21  A.  He has great character.

22  Q.  Okay.  Your terms of employment, has it been consistent?

23  A.  Yes, very consistent.

24  Q.  If the judge were to order him to appear, do you have any

25  doubt that he would appear?

May 24, 2019

1  A.  He would appear, yes.

2  Q.  Is he a man of his word?

3  A.  He is a man of his word, yes.

4  Q.  Does he obey people in positions of authority?

5  A.  He does, yes.  I've never had a problem with him disobeying.

6  Q.  Do you have any reason to believe he's a flight risk?

7  A.  No.

8  Q.  As it pertains to Mr. Saul Garcia, Jr., here, do you know

9  Mr. Saul Garcia, Jr.?

10  A.  Yes, sir, I do.

11  Q.  How long have you known Mr. Saul Garcia, Jr.?

12  A.  I've known him for a little over ten years.

13  Q.  Okay.  And what relationship do you have with Mr. Garcia,

14  Jr.?

15  A.  Same.  Personally and work.

16  Q.  Okay.  I guess you know Mr. -- Jr.'s related to Sr. right?

17  A.  Of course, yes, sir.

18  Q.  What other family ties do you know of that Garcia, Jr., has

19  to this area?

20  A.  As far as, you know, he's with his dad.  You know, it's

21  pretty much the same.  I mean, when you know that the Garcias

22  are doing something, it's the family that's doing it, you know.

23  It's not, you know -- they don't specifically say, okay, Sr. or

24  Jr.  It's the family that's doing this, you know.  Very strong

25  family values.

Case 2:19-cr-00096-PP   Filed 06/04/24   Page 18 of 121   Document 11

May 24, 2019

1   Q.  What about his character, Jr.?

2   A.  Great character.

3   Q.  Okay.  What about his employment history?

4   A.  Perfect.  You ask him to do something, he does it and he

5   does it correctly.  You don't have to tell him more than once.

6   Very loyal.

7   Q.  Do you have any reason to think he's a danger to his

8   community?

9   A.  No, sir, he's not a danger.

10  Q.  Do you have any knowledge of any run-ins with law

11  enforcement?

12  A.  No.

13  Q.  Do you have any reason to think he'd harm anyone?

14  A.  No, sir, he would not.

15  Q.  Okay.  If the judge ordered him to appear, do you have any

16  doubt he would appear?

17  A.  Yes, sir, he would appear.

18  Q.  And does he obey people in positions of authority?

19  A.  Yes, he does.  Yes, he does.

20  Q.  Do you have any doubt that he would appear as ordered?

21  A.  He would, yes.

22  Q.  Do you think he's a flight risk?

23  A.  No.

24  Q.  On to Mr. Daniel Garcia, who's sitting here, do you know

25  Mr. Daniel Garcia?

May 24, 2019

1   A.  Yes, sir, I do.

2   Q.  Okay.  Tell me how you know Mr. Daniel Garcia.

3   A.  Mr. Daniel, also through employment.  He handles most all

4   the paperwork for the Garcias.  So we deal with him, more of an

5   office-type relationship.

6   Q.  Okay.  And do you have personal contact with him?

7   A.  Yes, uh-huh, I do.

8   Q.  And based on that personal contact, what can you tell us

9   about his, kind of, physical and mental condition?

10  A.  It's perfectly fine.

11  Q.  And what about his character?

12  A.  He's of great character.  Very dependable.  If you ask him

13  to do something, it's there.  It's done.

14  Q.  Okay.  Does he have ties to the community?

15  A.  He does, yes.  And like I say, it's pretty much the family,

16  you know.  You know that if something's done, it's the Garcia

17  family that does it, you know.  Very, very strong family values.

18  Q.  Any reason to think Daniel is a danger to the community?

19  A.  No.  He's not.

20  Q.  Any reason -- any knowledge of run-ins with law enforcement

21  and Daniel?

22  A.  No.

23  Q.  Okay.  Any reason to think Daniel would harm anyone?

24  A.  No, he would not.

25  Q.  All right.  If the judge ordered Daniel to appear, do you

1   have any doubt that he would appear?

2   A.  He would appear.

3   Q.  Is he a man of his word?

4   A.  He is a man of his word, yes, he is.

5   Q.  And does he obey positions of authority?

6   A.  He does, yes.

7   Q.  And is he a flight risk?

8   A.  No, he is not a flight risk.

9           MR. CADLE:  No further questions for this witness, your

10  Honor.

11          THE COURT:  All right.  Mr. Crane, is there any -- I'm

12  thinking the best way to do this.  Does the government have any

13  objection to finishing the direct on each witness first?

14          MR. CRANE:  No, your Honor.  That's fine.

15          THE COURT:  All right.  So, Mr. Collum, any questions

16  for this witness on behalf of Consuelo Garcia?

17          MR. COLLUM:  Yes, your Honor.

18                     DIRECT EXAMINATION

19  BY MR. COLLUM:

20  Q.  Mr. Patrick, do you know Consuelo Garcia?

21  A.  Yes, I do.

22  Q.  Do you know her by Connie?

23  A.  I know her by Connie, yes.

24  Q.  Okay.  All right.  Now, all your answers that were given in

25  regard to Saul, Sr., Saul, Jr., and Daniel Garcia, would those

Case 2:19-cr-00096-PP   Filed 06/24/19   Page 21 of 121   Document 11

May 24, 2019

1  be the same answers as applied to Connie Garcia?

2  A.  They would be, yes.

3  Q.  Okay.  Well, let's just talk about that for a moment.  How

4  long have you known Connie?

5  A.  I've known Connie now for 15 years.

6  Q.  Fifteen years.  Do you have any reason to believe that she'd

7  be a danger to the community?

8  A.  No, she would not be a danger.

9  Q.  And she wouldn't try to intimidate anyone?

10  A.  No, no.

11  Q.  All right.  Has she always been prompt amid all of her

12  obligations that you know of?

13  A.  She has.  For us, she has.

14  Q.  Do you believe she would make all the court appearances?

15  A.  She would make all of them, yes.

16  Q.  Okay.  Now, if the judge were to impose any kind of

17  restrictions on her, do you have any doubt that she would be --

18  comply with those restrictions?

19  A.  Yes, she would comply.

20  Q.  All right.  Do you have any reason to believe that she's a

21  flight risk at all?

22  A.  No.

23  Q.  All right.  Now, what kind of character does Miss Connie

24  have?

25  A.  She has a great character.  She's very dependable.  When we

Case 2:19-cr-00096-PP   Filed 06/20/19   Page 22 of 121   Document 11
229-940-6818

May 24, 2019

1  need something, we'll call Connie, and Connie can take care of
2  it right there.  I mean, she's very punctual.  She's very
3  dependable.
4  Q.  All right.  Now, as far as safety to the community -- is she
5  active in the community?  Do you know of any of her activities?
6  A.  They are.  Yes, they are very active in the community.
7  Q.  Helping out in the community?
8  A.  Yeah, just helping.  Yeah, that's what I would know of, is
9  more of helping the community there in our small town.
10  Q.  Volunteer type work?
11  A.  Volunteer type stuff, you know.
12  Q.  All right.  And to your knowledge, based on your 15 years of
13  knowing Ms. Consuelo Garcia, she is not a risk to any of the --
14  to flee, correct?
15  A.  No, she's not a risk.
16  Q.  Okay.  And she doesn't pose a serious risk to the
17  defendants -- or, I'm sorry, she doesn't pose a serious risk to
18  obstruct any type of witnesses or anything like that, intimidate
19  any witnesses?
20  A.  No.
21        MR. COLLUM:  Okay.  All right.  No further questions at
22  this time, your Honor.
23        THE COURT:  And, Ms. Williams, any questions on behalf
24  of Ms. Maria Garcia-Olalde?
25        MS. WILLIAMS:  No, your Honor.

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 23 of 121   Document 11

May 24, 2019

1        THE COURT:  All right.  Mr. Crane, you may

2   cross-examine.

3        MR. CRANE:  Thank you, your Honor.

4                    CROSS EXAMINATION

5   BY MR. CRANE:

6   Q.  Mr. Patrick, you stated that these defendants are not a

7   danger to the community; is that correct?

8   A.  Yes, sir, I have.

9   Q.  What community are you referring to?

10  A.  Our community of Omega, Georgia.

11  Q.  What about the workers who are brought here under false

12  pretenses?

13  A.  I wouldn't know any workers that are brought here under

14  false pretenses.

15  Q.  All right.  You're unaware, I take it, of the allegations in

16  the indictment?

17  A.  Yes, sir.

18  Q.  Are those members of the community?

19  A.  I'm sorry.  Say that again?

20  Q.  You consider the workers that are brought here to work on

21  your farm to be members of the community?

22  A.  Yes, sir, I do.

23  Q.  Are you aware that they've been deprived of water on hot

24  days?

25  A.  No, sir.  On my farm, they have not.

Case 2:19-cr-00096-PP   Filed 06/04/24   Page 24 of 121   Document 11

May 24, 2019

1  Q.  Are you aware of that?  I'm not asking you to state

2  something you're unaware of.

3  A.  No, I'm not aware of -- they have water.

4  Q.  Are you aware that they were brought here under debt bondage

5  for your benefit?

6  A.  I don't agree with that.

7  Q.  All right.  Are you aware that some of the laborers are

8  required to turn over deeds to their property in Mexico in order

9  to secure a temporary migrant visa?

10  A.  No, sir, I'm not aware of that.

11  Q.  Did you turn a blind eye to it deliberately?

12  A.  No, sir, definitely not.

13  Q.  Are you aware that you benefit from a system of slave labor?

14  A.  No, sir.

15  Q.  You'd laugh at that.

16  A.  That is not, because it's so farfetched, I mean, that's just

17  not what's happening here.

18  Q.  Are you aware of the term "peonage"?

19  A.  No, sir.

20  Q.  That's a law term for slave labor, which you benefit from

21  according to the allegations in the indictment.

22  A.  I don't agree.

23  Q.  Do you benefit from this labor?

24  A.  From the H-2A labor, yes, sir, I benefit from it, yes, sir.

25  Q.  Very compliant workforce.

Case 2:19-cr-00096-PP   Filed 06/04/24   Page 25 of 121   Document 11

May 24, 2019

1    A.  Very compliant.

2    Q.  Very compliant.  Never complain.

3    A.  Never have, no, sir.

4    Q.  Never have to take them to the hospital on a hot day either,

5    do you?

6    A.  Sure, yes, sir.  If there is problems, we do.  We take them

7    to the hospital.  We take care of them.

8    Q.  Do you do that personally?

9    A.  I do not do it personally, no, sir.

10   Q.  One of the Garcias would take care of that, wouldn't they?

11   A.  Someone or someone in their organization would, yes, sir.

12   Q.  Right.  And those who complain, those who become ill are

13   sent back to Mexico promptly, aren't they?

14   A.  No, sir.

15   Q.  Well, do you know that or are you just guessing?

16   A.  Well, I know how, yeah, I know how things work on my farm.

17   No, sir, we don't just send them back because they're sick.

18   Q.  All right.  Are you aware that many of the workers that were

19   brought to Georgia were then illegally sent to work in

20   Wisconsin?

21   A.  No, sir.

22   Q.  How is it that you're unaware of that?

23   A.  I'm aware of it now, yes, but I was not aware of it at the

24   time.

25   Q.  Did you turn a blind eye to that fact?

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 26 of 121   Document 11

May 24, 2019

1   A.  I didn't know it at the time, no, sir.

2   Q.  Would it be fair to say there are many things about the

3   Garcias' organization that you're simply not aware of?

4   A.  As far as it involves my farm, no, sir, it wouldn't be fair.

5   Q.  Does it endanger someone to deprive them of water?

6   A.  Oh, sure it would, yes, sir.

7           MR. CRANE:  That's all I have, your Honor.

8           THE COURT:  All right.  Mr. Cadle, any redirect?

9           MR. CADLE:  No, your Honor.

10          THE COURT:  Mr. Collum, any redirect?

11          MR. COLLUM:  Briefly.

12                      REDIRECT EXAMINATION

13  BY MR. COLLUM:

14  Q.  Mr. Patrick, the H-2A program is a legal program, correct?

15  A.  Yes, sir, it is.

16  Q.  And is sanctioned by the U.S. government?

17  A.  Yes, sir, it is.

18  Q.  And how many H-2A workers do you have on your farm at this

19  time?

20  A.  We have a total of 400.

21  Q.  Four hundred workers.

22  A.  Yes, sir.

23  Q.  And how long do you utilize H-2A workers?

24  A.  We utilize them ten months out of the year.

25  Q.  How many years?

Case 2:19-cr-00096-PP    Filed 06/24/19   Page 33 of 121    Document 11

May 24, 2019

1  A.  We started in 1997.

2  Q.  Have you ever had a problem with them?

3  A.  No, sir.

4  Q.  Has the government ever had a problem with you having the

5  H-2A workers?

6  A.  No, sir, never.

7  Q.  And who are the people who represent those H-2A workers for

8  you?

9  A.  I have two, Garcias and Vásquez.

10        MR. COLLUM:  Thank you.  No further questions, your

11  Honor.

12        THE COURT:  Does that leave anything further from the

13  government?

14        MR. CRANE:  No, your Honor.

15        THE COURT:  All right.  Mr. Patrick, thank you very

16  much, sir.

17        THE WITNESS:  Yes, sir.  Thank you.

18        THE COURT:  You may step down.

19     All right, Mr. Cadle, you may call your next witness.

20        MR. CADLE:  Mr. Brent Blozier.

21        THE COURT:  Mr. Crane, does the government have any

22  objection to Mr. Patrick being excused?

23        MR. CRANE:  No, your Honor.

24        THE COURT:  All right.  So I'll leave that to you,

25  Mr. Cadle.  If you want to tell him he can leave, he can --

Case 2:19-cr-00096-PP   Filed 06/24/19   Page 28 of 121   Document 11

1      (Discussion off the record)

2              THE COURTROOM DEPUTY:  Raise your right hand.

3                  THE WITNESS, BRENT BLOZIER, IS SWORN

4              THE COURT:  Good morning, sir.

5              THE WITNESS:  Good morning.

6              THE COURT:  The microphone looks about the right height

7      but --

8              THE WITNESS:  Okay.

9              THE COURT:  Yeah, I think you'll speak up just fine.

10     All right.  Mr. Cadle?

11                      DIRECT EXAMINATION

12     BY MR. CADLE:

13     Q.  Would you state your name for the Court, please, sir?

14     A.  It's Brent Blozier.

15     Q.  Okay.  And what do you do, Mr. Blozier?

16     A.  Farm.

17     Q.  And with what farm?

18     A.  Evergreen Produce.

19     Q.  What's your role at Evergreen Produce?

20     A.  I'm the owner.  And we grow vegetables.

21     Q.  What vegetables do you grow?

22     A.  We grow cucumbers and cabbage and different mixed

23     vegetables.

24     Q.  All right.  How long have you been Evergreen?

25     A.  It would be like ten, ten years.  I've been farming for 25.

Case 2:19-cr-00096-PP   Filed 06/24/94   Page 33 of 121   Document 11

May 24, 2019

1  Q.  Okay.  Do you know Mr. Saul Garcia, Sr., who's sitting here

2  today?

3  A.  Yes.

4  Q.  Okay.  How do you know Mr. Saul Garcia, Sr.?

5  A.  They do my harvesting.

6  Q.  Okay.  So any of your vegetables, cucumbers, all that stuff,

7  they harvest?

8  A.  And pack.

9  Q.  And pack.  Okay.  How many folks are associated with

10  Mr. Garcia's association that work with you?

11  A.  Normally like 50 or something like that.

12  Q.  Okay.  How long out of the year do they help you out?

13  A.  It's normally like ten months of --

14  Q.  And I'm sorry if I asked you this.  How long have you known

15  Mr. Garcia?

16  A.  Two years.

17  Q.  Okay.  And how did you become acquainted with Mr. Garcia?

18  A.  I used to contract my labor, you know, myself and then

19  decided I wanted to get somebody to take care of it, so that's

20  how I got to know them.

21  Q.  Okay.  And does Mr. Garcia show up when he needs to show up?

22  A.  Oh, yeah.  They're great workers.

23  Q.  And do you have any reason to think he's a danger to the

24  community?

25  A.  Oh, no.

Case 2:19-cr-00096-PP   Filed 06/24/19   Page 30 of 121   Document 11

May 24, 2019

1  Q.  And do you have any knowledge that Mr. Garcia, Jr. -- or Sr.
2  has had any run-ins with law enforcement?
3  A.  No.
4  Q.  And do you any reason to think he'd ever harm anyone?
5  A.  No.
6  Q.  Based on your interaction with him, can you tell me what you
7  know about Mr. Garcia, Sr.,'s, family ties?
8  A.  Well, they're a close family.  They, like I said, they all
9  work together.  They, you know, they're just a great,
10  hardworking family.
11  Q.  Okay.  What do you know about Mr. Garcia, Sr.,'s physical
12  and mental condition?
13  A.  He's just, you know, he's a good father and he's, you know,
14  always talking with his boys and everything.
15  Q.  Okay.  If the judge gave him restrictions with which he
16  could be released today, do you think he would comply with those
17  restrictions?
18  A.  Oh, yeah.
19  Q.  Okay.  Do you think the Court could set conditions that
20  would reasonably assure their appearance and the safety of the
21  community?
22  A.  Oh, yeah.  They have crops, like I said, and they have --
23  you know, they harvest for us too.
24  Q.  If the judge were to order them to appear, do you have any
25  doubt he would appear?

Case 2:19-cr-00096-PP   Filed 06/04/24 03:33 of 121   Document 11
229-405-6818

May 24, 2019

1   A.  Oh, yeah, they'd be here.

2   Q.  All right.  Is he a man of his word?

3   A.  Yes, 100 percent.

4   Q.  Is he a flight risk?

5   A.  No.

6   Q.  And does he obey people in positions of authority?

7   A.  Do what, now?

8   Q.  Does Mr. Garcia, Sr., obey people in positions of authority?

9   A.  Oh, yeah.  Yeah, he's a real respectful man.

10  Q.  All right.  Mr. Saul Garcia, Jr., I guess you've known him

11  the same amount of time?

12  A.  Yeah, two, two years.

13  Q.  Okay.

14  A.  Two or (inaudible).

15  Q.  Do you have any reason to think Mr. Garcia, Jr., is a danger

16  to his community?

17  A.  Oh, no.

18  Q.  And do you have any knowledge that he's had any run-ins with

19  law enforcement?

20  A.  No.

21  Q.  Do you think he would harm anyone?

22  A.  Oh, no.

23  Q.  Do you think he'd obstruct any kind of witness?

24  A.  No.

25  Q.  Do you think the Court can set conditions that will

Case 2:19-cr-00096-PP    Filed 06/24/19    Page 32 of 121    Document 11

May 24, 2019

1   reasonably assure he would appear and that this community would
2   be safe?
3   A.  Yes, 100 percent.
4   Q.  If the judge orders Jr. to appear, do you have any doubt he
5   would appear?
6   A.  Yes, he would be here.
7   Q.  Is he a man of his word?
8   A.  Yes.
9   Q.  Does he obey people in a position of authority?
10  A.  Yes.
11  Q.  And is he a flight risk?
12  A.  Oh, no.
13  Q.  All right.  Mr. Daniel Garcia, who's sitting here, do you
14  know him?
15  A.  Yes.
16  Q.  All right.  Known him the same time?
17  A.  Same amount of time.
18  Q.  All right.  Do you think the Court can set conditions that
19  will reasonably assure that he will appear and that the
20  community will be safe?
21  A.  Yes.
22  Q.  Do you have any reason to think Mr. Daniel Garcia is a
23  danger to this community?
24  A.  No.
25  Q.  Do you have any knowledge that Mr. Daniel Garcia has had any

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 33 of 121   Document 11
229-405-6818

May 24, 2019

1   run-ins with law enforcement?

2   A.  No.

3   Q.  Do you have any reason to think Daniel Garcia would harm

4   anyone?

5   A.  No.

6   Q.  Do you think Daniel Garcia would obstruct any witnesses?

7   A.  No, unh-unh.

8   Q.  From interacting with him, what do you know of Mr. Daniel

9   Garcia's physical and mental conditions?

10  A.  He's good -- I mean, like I said, they're all good,

11  hardworking people.

12  Q.  Okay.  Would he comply with restrictions given by the Court?

13  A.  Yes.

14  Q.  And would he be prompt and make court appearances?

15  A.  Yes.

16  Q.  If the judge ordered him to appear, he'd appear?

17  A.  Yes.

18  Q.  And is he a man of his word?

19  A.  Yes.

20  Q.  And is he a flight risk?

21  A.  No.

22          MR. CADLE:  No further questions, your Honor.

23          THE COURT:  All right, Mr. Collum, any questions for

24  Consuelo Garcia?

25          MR. COLLUM:  Just for the record.

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 34 of 121   Document 11
229-405-8818

May 24, 2019

```
 1                    DIRECT EXAMINATION
 2   BY MR. COLLUM:
 3   Q.  Mr. Blozier -- Blozier.  I'm sorry.
 4   A.  Blozier.
 5   Q.  You don't really have any information about Consuelo Garcia,
 6   do you?
 7   A.  No.  We hadn't met, but I've heard a lot about her, yes,
 8   sir.
 9   Q.  Okay.  But from what you've heard, she has a good
10   reputation?
11   A.  Oh, yes.  Yeah.
12          MR. COLLUM:  I believe Ms. Williams may have some
13   questions, your Honor.
14          THE WITNESS:  Okay.
15          THE COURT:  All right.  Ms. Williams on behalf of Maria
16   Garcia-Olalde.
17                    DIRECT EXAMINATION
18   BY MS. WILLIAMS:
19   Q.  Good morning.
20   A.  Good morning.
21   Q.  How long have you known Maria Garcia-Olalde?  She's the one
22   on the end.
23   A.  Yeah.  The same, I think the same amount of time.  She came,
24   she came to work at my farm.  And I see her most every day.
25   Q.  So you've known her for about two years.
```

Case 2:19-cr-00096-PP   Filed 06/24/19   Page 35 of 121   Document 11

1   A.   Pretty much, yes, ma'am.

2   Q.   And what type of work does she do?

3   A.   Well, when she first came, you know, she kind of helped do

4   some supervising of the crew and helped us pack and everything.

5   So she did that.  And she still does.  But they also have a crop

6   at the farm.  They got peppers.  And she's doing the watering,

7   the fertilizer, and growing the crop.  And she's there every

8   morning and every afternoon.

9   Q.   And about how many hours a day does she work?

10  A.   Probably anywhere from 14 to 16 hours a day.

11  Q.   And how many days a week would that be?

12  A.   They work mostly seven days a week.  There are some times we

13  don't work on Sundays unless it's really something pushing, but

14  as far as growing a crop, you got to be there seven days a week

15  pretty much.

16  Q.   Okay.  And how does she interact with other coworkers?

17  A.   She's great.

18  Q.   Now, are you afraid of her?

19  A.   Oh, no.

20  Q.   Have you ever seen her behave in a violent manner with

21  anyone?

22  A.   No, ma'am.

23  Q.   Have you ever seen her and thought that she was under the

24  influence of drugs or alcohol?

25  A.   Oh, no.  No.  Not doing what she does.  You can't be doing

Case 2:19-cr-00096-PP   Filed 06/24/19   Page 36 of 121   Document 11

May 24, 2019

1  that.

2  Q.  Have you ever seen her with a gun?

3  A.  No.

4  Q.  Do you have any reason to believe that she is or would be a

5  danger to the community?

6  A.  No.

7  Q.  And as far as family ties, can you tell me any of the family

8  members of hers that work with her?

9  A.  Well, like I say, they all work together with the brothers

10 and -- Saul, Sr., and his brother, which I've only met, like,

11 maybe one time.  But they all work together.  They're just a

12 working family.

13 Q.  Okay.  And so when you say they "all" are, you're referring

14 to the other Garcias.

15 A.  Right.  Yeah.

16 Q.  Yes, sir.  Now, do you believe if she were given a bond,

17 that she would return to court?

18 A.  Yes, ma'am.

19 Q.  And if given a bond, do you believe she would return to

20 work?

21 A.  Oh, yeah.  She's got responsibilities.

22 Q.  Okay.  And do you believe that she would tamper with or try

23 to harass witnesses in this case?

24 A.  No.

25 Q.  Could you describe her temperament or her mannerisms as far

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 37 of 121   Document 11

May 24, 2019

1  as what you've observed over the course of the last two years,

2  just seeing her.

3  A.  Oh, I mean, we just, we speak.  And she don't know, really,

4  I don't think, any English much, you know.  And I say buenos

5  dias and she says, you know, just the same thing.  And we see

6  each other in the mornings or in the afternoon.  And we wave and

7  we -- our interaction, we just kind of smile, so, you know,

8  that's how we interact.

9  Q.  And she's always pleasant?

10 A.  Yes.

11 Q.  Have you ever seen her being unpleasant?

12 A.  Unh-unh, no.

13          MS. WILLIAMS:  All right.  No further questions of this

14 witness, your Honor.

15          THE COURT:  All right.  Mr. Crane, cross examination?

16          MR. CRANE:  Yes.

17                    CROSS EXAMINATION

18 BY MR. CRANE:

19 Q.  Good morning, sir.

20 A.  Good morning.

21 Q.  Now, you stated with regard in particular to Ms. Maria

22 Garcia that she would not instruct any witness to lie or

23 obstruct justice; is that correct?

24 A.  That's correct.

25 Q.  Have you read the indictment in this case?

Case 2:19-cr-00096-PP   Filed 06/24/19   Page 38 of 121   Document 11

May 24, 2019

1  A.  Just what I saw, some little briefing that I saw on my phone

2  or something.

3  Q.  Are you aware that she's been charged with obstruction of

4  labor-trafficking investigations?

5  A.  I don't know all the technical terms but --

6  Q.  Well, let me ask you this.  You've just testified that she

7  would not obstruct justice.

8  A.  Uh-huh.

9  Q.  Are you aware that, in fact, she has been charged with

10  attempting to obstruct justice?

11  A.  She may have been -- I don't -- you know, if she's charged

12  that way, but I don't, I don't see -- she does not have that

13  attitude.  She has a great personality.  Like I said, we smile

14  and talk.

15  Q.  So you have no basis for believing the charges are true --

16  A.  Right.

17  Q.  -- or untrue against her?

18  A.  That's right, yeah, I don't believe that they're true, no.

19  Q.  Are you aware also that Saul Garcia is charged with witness

20  tampering?

21  A.  I don't, I don't -- like I said, I don't know the technical

22  terms of it, but that's something I wouldn't see out of him

23  either.

24  Q.  Would it be fair to say that there's many things out of the

25  Garcias that you don't see?

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 39 of 121   Document 11

May 24, 2019

1  A.  Like I said, I just, I've never seen them acting any way

2  like that, that they're just good people.

3  Q.  All right.  You testified I believe with respect to

4  Ms. Maria Garcia that she works 14 hours a day?

5  A.  I'm sure -- well, everybody does, 14, 16 hours a day.

6  Q.  Including the laborers.

7  A.  No.  They go in at, like, 6 in the afternoon.

8  Q.  Are you sure sometimes they're not forced to work 14-hour

9  days for your benefit?

10 A.  No, unh-unh.  They work because they have crops.  And

11 they're looking after crops.

12 Q.  Are you surprised if, in fact, the laborers aren't required

13 to work additional hours?

14 A.  Nah, I mean, we schedule everything to where work is done by

15 a certain time in the afternoon.

16 Q.  Well, apparently not for Ms. Maria Garcia if she works 14

17 hours a day.

18 A.  Well, she, like I said, she's looking after the crop.

19 Q.  Well, she's not actually doing work.  That's done by the

20 migrant laborers.

21 A.  Well, like I said, she's got a different responsibility as

22 far as growing a crop.

23 Q.  Do you know how hot it's going to be today?

24 A.  I think they said 95 or something, 94.

25 Q.  Ninety-five to 97.  Is it dangerous to allow people to work

Case 2:19-cr-00096-PP   Filed 06/24/24   Page 40 of 121   Document 11

1   in the fields without water in these conditions?

2   A.  Water is supplied.

3   Q.  Would you be surprised to learn that on occasion the Garcias

4   deprive the workers of water to the point where they pass out?

5   A.  Yeah, I would be surprised, because, I mean, there's water

6   in the fields.  I see water in the fields and stuff, so.

7   Q.  Now, as to Ms. Consuelo Garcia, are you aware that she

8   created fraudulent identity documents so that workers from your

9   farm could go work in Wisconsin?

10  A.  No, I don't --

11  Q.  So is it fair to say that there's a great deal that goes on

12  that you're simply entirely unaware of?

13  A.  Well --

14  Q.  Or do you deliberately turn a blind eye to it?

15  A.  No.

16  Q.  Do you know what --

17  A.  Like I say, I don't -- I haven't met her so, no, I don't

18  know on that part of it.  We just, we just work, you know, and

19  they, you know -- we work the crops and gather the crops.

20  Q.  Right.  And you need a cheap and compliant labor force in

21  order to make a profit, don't you?

22  A.  No, it's not cheap.  We are required to pay a certain amount

23  in the H-2A program.  So we pay -- I don't know what the new

24  rate is; I can't remember.  But, no, it's not cheap, no, not by

25  no means.

May 24, 2019

1   Q.  Are you aware of the legal term "peonage"?

2   A.  Who?

3   Q.  Peonage.  I wouldn't expect you necessarily to know of it.

4   A.  Unh-unh.

5   Q.  Do you realize that it's slave labor?

6   A.  No, I don't --

7   Q.  And that you've benefited from it?

8   A.  No, it's not slave labor, not when you're paying this rate

9   that we pay.

10  Q.  Well, how do you know the workers are actually getting paid

11  that money?

12  A.  It's required.

13  Q.  Well, do you know that personally, or do the Garcias not, in

14  fact, siphon off and steal the money from the laborers?

15  A.  No, I don't -- that shouldn't be possible.

16  Q.  Well, it shouldn't be, but that's what lands us here in

17  court today, isn't it?

18  A.  (No audible response)

19  Q.  So you have no personal knowledge of whether these

20  defendants steal money from the laborers who you bring in the

21  country, do you?

22  A.  No, unh-unh.

23  Q.  You have no idea that they send these laborers to Wisconsin

24  to work in even more difficult conditions, do you?

25  A.  Like I said, I've been using them since 2017.  That's, you

Case 2:19-cr-00096-PP   Filed 06/06/24   Page 42 of 121   Document 11

May 24, 2019

1  know --

2  Q.  And you've never seen any indication of any sort of

3  irregularity in their treatment?

4  A.  No.

5            MR. CRANE:  Thank you.

6            THE COURT:  All right.  Mr. Cadle, any redirect?

7            MR. CADLE:  No, your Honor.

8            THE COURT:  Let's see.  Mr. Collum, I can't remember if

9  you even asked --

10           MR. COLLUM:  I just asked a brief question about my

11  client's character, and there was cross examination dealing with

12  my client.  May I just briefly --

13           THE COURT:  All right.

14                       REDIRECT EXAMINATION

15  BY MR. COLLUM:

16  Q.  Mr. Blozier, the H-2A program is a program sanctioned by the

17  government, correct?

18  A.  That's correct.

19  Q.  You utilize that program, correct?

20  A.  That's correct.

21  Q.  About how many H-2A workers do you have working on your

22  farm?

23  A.  Normally 50 to 75.

24  Q.  Okay.  And, to your knowledge, they all get paid, correct?

25  A.  That's correct.

Case 2:19-cr-00096-PP   Filed 06/24/19   Page 43 of 121   Document 11

May 24, 2019

1  Q.  Okay.  And has anyone come to you, any of those workers come

2  to you and tell you they're not getting paid?

3  A.  No, no one.

4  Q.  Has any of them complained about their treatment?

5  A.  No.

6  Q.  Okay.  And who supervises or manages those H-2A workers?

7  A.  The Garcias.

8          MR. COLLUM:  Thank you.  No further questions.

9          MR. CRANE:  Just very briefly.

10          THE COURT:  All right, let me catch Ms. Williams first,

11  Mr. Crane.

12          MR. CRANE:  Very well.

13          THE COURT:  Ms. Williams, any redirect?

14          MS. WILLIAMS:  No, your Honor.

15          THE COURT:  Okay.  Now, Mr. Crane, you may recross.

16                  RECROSS EXAMINATION

17  BY MR. CRANE:

18  Q.  You stated that the workers don't come to you to complain

19  about conditions; is that correct?

20  A.  No, I've never had one, anyone come to me.

21  Q.  Well, in fact, you can't speak Spanish, so it wouldn't do

22  them much good, would it?

23  A.  Most times there's translators around.

24  Q.  All right.  No one has ever come to complain --

25  A.  No.

May 24, 2019

1  Q.  -- that they didn't get water.

2  A.  No.

3  Q.  No one has ever come to complain that their passports were

4  taken from them under threat.

5  A.  No.

6  Q.  No one has ever come to complain that they were threatened

7  with deportation.

8  A.  No.

9  Q.  No one has ever come to tell you that they're being shipped

10  off to Wisconsin under false pretenses?

11  A.  No.

12  Q.  That Consuelo Garcia is creating false green cards and

13  documents and identity documents.

14  A.  No.

15  Q.  Did you deliberately turn a blind eye to this --

16  A.  No.

17  Q.  -- slave labor that you benefited from?

18  A.  No.

19          MR. CRANE:  Thank you.

20          THE COURT:  All right.  Let's see.  Thank you,

21  Mr. Blozier.  Any objection to him being excused?

22          MR. COLLUM:  No, your Honor.

23          MR. CADLE:  No, your Honor.

24          MS. WILLIAMS:  No, your Honor.

25          MR. CRANE:  No.

Case 2:19-cr-00096-PP   Filed 06/24/19   Page 45 of 121   Document 11

1        THE COURT:  All right.  Thank you, Mr. Blozier.  You're

2   excused, which means you can either leave the courthouse, or you

3   can sit in the courtroom, whatever you prefer.

4        All right.  Any other witnesses, Mr. Cadle?

5        MR. CADLE:  Ms. Judy Burnham.

6   (Discussion off the record)

7        THE COURTROOM DEPUTY:  Raise your right hand.

8            THE WITNESS, MARTY MILLER, IS SWORN

9        THE COURT:  Good morning, sir.  You may step down and

10  the lawyers will have a few -- I mean sit down, is what I meant.

11       THE WITNESS:  Thank you, your Honor.

12       THE COURT:  If you'd just speak up into that

13  microphone.

14       All right.  Mr. Cadle?

15                    DIRECT EXAMINATION

16  BY MR. CADLE:

17  Q.  Could you state your name, please, sir.

18  A.  Marty Miller.

19  Q.  And what do you do, Mr. Miller?

20  A.  I'm the accountant for Patrick Farms.

21  Q.  Okay.  And as the accountant, what's your day-to-day look

22  like?

23  A.  So every day I review our cash and I review our sales.  I

24  review our accounts payables.  You know, I do forecasting and

25  budgeting and make sure that all of our daily operations are

Case 2:19-cr-00096-PP   Filed 06/04/24   Page 46 of 121   Document 11

May 24, 2019

1  running as they should.

2  Q.  Okay.  Do you have interactions with Mr. Garcia, Sr.?

3  A.  I do.

4  Q.  And Mr. -- and Jr.?

5  A.  Yes.

6  Q.  And Mr. Daniel; is that correct?

7  A.  Yes, I do.

8  Q.  How long -- how did you become acquainted -- how long have

9  you been at Patrick Farms as the accountant?

10  A.  So I've been there for nine years now.

11  Q.  Okay.  I guess you've got accounting training?

12  A.  I do.  I have a bachelor degree in accounting.

13  Q.  Okay.  And where did you get that from?

14  A.  Georgia Southern University.

15  Q.  Okay.  And how long have you been at the farm?

16  A.  I've been at the farm for nine years.

17  Q.  And did you work anywhere else before that?

18  A.  I did.  I've worked as an accounting manager for about ten

19  years before that.

20  Q.  When you say "accounting manager," what was that?

21  A.  So my actual title was controller.  That means I managed the

22  whole accounting department.  I ran the payroll, accounts

23  payable, accounts receivable, sales.

24  Q.  In your job, how have you had reason to become acquainted

25  with Mr. Saul Garcia, Sr.?

Case 2:19-cr-00096-PP   Filed 06/04/9403agB34B of 121   Document 11

May 24, 2019

1   A.  They provide labor services for Patrick Farms.  In fact,

2   they provide about half the labor force for our farm for

3   harvesting our crops, planting our crops.

4   Q.  What kind of interactions, can you tell the Court what kind

5   of interactions you have with Mr. Garcia, Sr.?

6   A.  So we meet every year to review our prices and rates that

7   we're going to pay for the labor.  We review our crops and what

8   our needs are for head count and what times of the year we're

9   going to need that head count.  And we assist in discussing the

10  H-2A contracts and the timing of those contracts.

11  Q.  What kind of interaction do you have with Saul Garcia, Jr.?

12  A.  With Jr., he actually is growing some crops now for Patrick

13  Farms.  So he's a grower for us.  So, you know, I work with him

14  on reviewing the sales on his product and any kind of costs that

15  we have associated with that and of course paying him for that.

16  He also comes and picks -- in the past would come and pick up

17  the paychecks for their labor force.

18  Q.  Okay.  And then what about Saul Garcia -- I'm sorry.

19  Mr. Daniel Garcia.

20  A.  Same thing.  Daniel's involved a lot with the payroll.  So

21  over the years I've watched Daniel grow up and become more

22  involved with the family business.  He now participates when we

23  have meetings discussing labor.  Sometimes we talk about, you

24  know, questions related to payroll or tax questions.  Or we may

25  attend seminars together that are related to labor -- not

1   together but at the same seminars that we all have to attend as

2   managing employees.

3   Q.  Okay.  And can you remind me how long you've been knowing

4   the family?

5   A.  So I've known the family for the entire nine years I've been

6   with Patrick Farms.

7   Q.  Okay.  And during that time, as it concerns Mr. Saul Garcia,

8   Sr., do you have any reason to think he's a danger to the

9   community?

10  A.  No, I do not.  He's an asset, in my opinion, to both Patrick

11  Farms and the community.

12  Q.  Okay.  Do you have any knowledge that he's had any run-ins

13  with law enforcement?

14  A.  No.  I've heard hearsay recently related to this incident,

15  but otherwise, I've never seen, experienced, or known of

16  anything negative about Mr. Garcia.

17  Q.  Do you have any reason to think that Mr. Garcia, Sr., would

18  harm anyone?

19  A.  I do not.

20  Q.  Do you have any reason to think he would obstruct any

21  witnesses in this case?

22  A.  No, I do not.

23  Q.  Can you tell me about what you've observed in the meetings

24  and stuff as it indicates Mr. Garcia, Sr.,'s physical and mental

25  condition?

May 24, 2019

1  A.  He's very, very knowledgeable.  He understands his labor,

2  and he understand what's required for the crops and for our

3  needs.  He's very, very kind and a very good -- very good

4  businessman, very professional, very nice and courteous to us.

5  And we always work well together in negotiations.

6  Q.  Do you have any reason to think that he would not comply

7  with any restrictions that the Court were to provide?

8  A.  No, I don't see any reason he would not comply.

9  Q.  Okay.  Do you think he would be prompt and make his court

10  appearances?

11  A.  I do believe he would.  He always attends our meetings

12  promptly and timely.  Anytime we schedule a meeting, he's there

13  right on time.

14  Q.  And do you have -- if the judge ordered him to appear, do

15  you have any doubt that he would appear?

16  A.  No, I have no doubt.

17  Q.  Is he a man of his word?

18  A.  He is a man of his word.

19  Q.  Does he obey people in positions of authority?

20  A.  Yes, he does.

21  Q.  Is he a flight risk?

22  A.  No, he's not.

23  Q.  As it concerns Mr. Saul Garcia, Jr., you said that he's a

24  grower, right?

25  A.  He's currently a grower for Patrick Farms.  Of course, just

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 50 of 121   Document 11
229-403-6810

May 24, 2019

1    as I have with Daniel, I've watched him grow up with the family

2    and become more involved with the business.  Only recently did

3    we start dealing directly because he is one of the growers

4    growing some greens for Patrick Farms and some other products

5    that we're working together to sell for him.

6    Q.  Okay.  And in his role as a grower, have you had an

7    opportunity to assess his physical and mental condition?

8    A.  He's very professional when we see him, very courteous and

9    kind.  I've never had indication otherwise.  He seems like a

10   very bright young man.

11   Q.  Do you have any reason to think he's a danger to this

12   community?

13   A.  No, I do not.

14   Q.  Do you have any knowledge of any run-ins with law

15   enforcement other than what we're here about today?

16   A.  No, sir, I do not.

17   Q.  Do you have any reason to think he'd harm anyone?

18   A.  No.

19   Q.  Do you think he'd obstruct any witnesses?

20   A.  No.

21   Q.  Do you think that he would comply with the restrictions that

22   the judge provides?

23   A.  Yes, I do.

24   Q.  Do you think he'd be prompt and make his court appearances?

25   A.  Yes, I think he would.

Case 2:19-cr-00096-PP   Filed 06/04/94   Page 53 of 121   Document 11
229-405-8818

May 24, 2019

1  Q.  If the judge ordered him to appear, do you have any doubt

2  that he would appear?

3  A.  I have no doubt that he would appear.

4  Q.  Is he a man of his word?

5  A.  He is a man of his word.

6  Q.  Does he obey people in positions of authority?

7  A.  Yes.

8  Q.  And is he a flight risk?

9  A.  No, he is not.

10 Q.  All right.  As it concerns Daniel, could you remind me how

11 you know -- what interactions you've had with Daniel.

12 A.  So, as I've said, I have watched Daniel grow up and become

13 involved with the business.  He has helped with the payroll.  He

14 asks questions all along.  We discuss, you know, how payroll is

15 managed, how piece rates are managed.  He participates in

16 meetings with Saul, Sr., to negotiate our contracts each year

17 and what our labor force needs are, what H-2A requirements are

18 as far as head count.  And we have sitting meetings together

19 regarding payroll issues.

20 Q.  Based on those, what can you tell the Court about his

21 physical and mental condition?

22 A.  He's very sound of mine.  He's very professional.  He's very

23 kind and courteous.  He's just a good person all the way around.

24 Q.  Do you have any reason to think he's a danger to this

25 community?

Case 2:19-cr-00096-PP   Filed 06/04/24   Page 52 of 121   Document 11

May 24, 2019

1   A.  I do not.

2   Q.  Do you have any knowledge of any run-ins with law

3   enforcement?

4   A.  I do not.

5   Q.  Do you have any reason to think he'd harm anyone?

6   A.  No, sir.

7   Q.  Do you have any reason to think he'd obstruct a witness?

8   A.  No, sir.

9   Q.  If the judge gave him conditions and restrictions, would he

10  comply with them?

11  A.  Yes, he would.

12  Q.  If the judge ordered him to appear, do you have any doubt

13  that he would appear?

14  A.  I have no doubt he would appear.

15  Q.  Is he a man of his word?

16  A.  He is a man of his word.

17  Q.  Does he obey people in positions of authority?

18  A.  Yes, he does.

19  Q.  And is he a flight risk?

20  A.  No, he is not.

21          MR. CADLE:  No further questions, your Honor.

22          THE COURT:  All right.  Mr. Collum for Consuelo Garcia?

23                   DIRECT EXAMINATION

24  BY MR. COLLUM:

25  Q.  Mr. Miller, do you know Consuelo Garcia?

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 53 of 121   Document 11

May 24, 2019

1    A.   (No audible answer)

2    Q.   Do you know her as Connie?

3    A.   I do, I do.

4    Q.   You know her as Connie Garcia, correct?

5    A.   Now, I've only met her at a few seminars in the past.  We

6    normally talk by either phone or email.

7    Q.   Okay.  Now, but you talk by phone a lot?

8    A.   Not a lot.

9    Q.   Okay.

10   A.   Just a little bit every year.

11   Q.   What would you say on average?

12   A.   Once a year, maybe.

13   Q.   In all your dealings with her, do you have any indication

14   that she would be a flight risk?

15   A.   I do not.

16   Q.   Do you think that she would try to intimidate any witnesses

17   in this case?

18   A.   No, she would not.

19   Q.   Do you think that she is a danger to the community?

20   A.   No, she's not.

21   Q.   Okay.  Now, based on your experience with her over the last

22   two years, do you believe that if the judge imposed any

23   restrictions on her, that she would comply with those

24   restrictions?

25   A.   She would comply.

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 54 of 121   Document 11

May 24, 2019

1  Q.  Do you think she would make all of her court appearances?

2  A.  I do believe she would.

3       MR. COLLUM:  No further questions, your Honor.

4       THE COURT:  Ms. Williams, any questions on behalf of

5  Ms. Maria Garcia-Olalde?

6       MS. WILLIAMS:  No, your Honor.

7       THE COURT:  All right.  Any cross examination,

8  Mr. Crane?

9       MR. CRANE:  Yes, your Honor.

10                    CROSS EXAMINATION

11  BY MR. CRANE:

12  Q.  Now, Mr. Miller, you said that one of the Garcias,

13  Mr. Garcia, Sr., I believe, would pick up paychecks?

14  A.  It was Garcia, Jr., or Daniel in the past.

15  Q.  Any of the three.

16  A.  Any of the three could at any time, yes, sir.

17  Q.  Are you aware that the Garcias have required employees to,

18  quote, pay additional, what they call, taxes --

19  A.  No, sir, I'm completely unaware of that.

20  Q.  Are you aware that Ms. Connie Garcia created a set of false

21  documents so that workers from your Patrick Farms could go up to

22  Wisconsin?

23  A.  I'm unaware of that.

24  Q.  Did they ever discuss with you the idea that workers under

25  the H-2 Visa program authorized to work in Georgia only would be

Case 2:19-cr-00096-PP   Filed 06/24/24   Page 55 of 121   Document 11

May 24, 2019

1  shipped out of state?

2  A.  They never discussed anything with me regarding that.  We

3  understand clearly that H-2A workers are assigned to work a

4  specific location for a specific farm.

5  Q.  And they didn't discuss with you that they would force their

6  laborers to turn over their passports?

7  A.  No, sir.

8  Q.  Did you ever do that?

9  A.  No, sir, we do not.

10  Q.  Did you ever create a false green card?

11  A.  No, sir.

12  Q.  Would it be fair to say that the Garcias kept you in the

13  dark about many of their activities?

14  A.  I can't answer that.

15        MR. CRANE:  That's all I have, your Honor.

16        THE COURT:  All right.  Any redirect, Mr. Cadle?

17        MR. CADLE:  None, your Honor.

18        THE COURT:  Mr. Collum?

19        MR. COLLUM:  No, your Honor.

20        THE COURT:  All right.  Thank you, Mr. Miller.  You may

21  step down.

22     And any objection to Mr. Miller being excused?

23        MR. CADLE:  None, your Honor.

24        MR. COLLUM:  No, your Honor.

25        THE COURT:  All right.  You're excused, Mr. Miller.

Case 2:19-cr-00096-PP   Filed 06/24/19   Page 56 of 121   Document 11
229-405-8810

May 24, 2019

1    Thank you, sir.

2        The Court's going to stretch for a minute.  Anybody that

3    wants to join me, you're welcome to.

4            MR. CADLE:  Your Honor, one of my clients indicates

5    that he needs to go to the rest room.

6            THE COURT:  All right.  Let's see.  Why don't we go

7    ahead, then, and take a ten-minute break.  We've been going a

8    little over an hour.  We'll recess for ten minutes.

9            MR. CADLE:  Thank you, your Honor.

10    (Recess from 10:35 a.m. to 10:44 a.m.)

11            THE COURT:  All right.  I think I jumped the gun.

12    Maybe it's nine minutes, if I'm counting right.  We'll be at

13    ease for a little bit.

14    (Pause)

15            THE COURT:  And you're Ms. Newberry?

16    (No audible response)

17            THE COURT:  Good morning to you, ma'am.

18            MS. NEWBERRY:  Good morning.  How are you?

19            THE COURT:  I'm doing fine.  We'll get going in a few

20    minutes.  Give everybody a chance to get back.

21    (Pause)

22            THE COURT:  Mr. Cadle, how many witnesses are you

23    expecting after Ms. Newberry?

24            MR. CADLE:  Four, your Honor.

25            THE COURT:  Four more?

Case 2:19-cr-00096-PP   Filed 06/04/24   Page 58 of 121   Document 11

May 24, 2019

1          MR. CADLE:  Yes, your Honor.

2          THE COURT:  Well, at some point I think it's going to

3    become cumulative to what I've heard.  I mean, I'll let you go

4    on with another one or two, but I'm getting the gist of it.  No

5    reason to hear the same thing over and over again.  But I'll let

6    you go for now.

7       Mr. Collum, how many witnesses do you expect?

8          MR. COLLUM:  Your Honor, this one we're all going to

9    share, I believe.

10         MR. CADLE:  Two more.  Just two.

11         MR. COLLUM:  I only have two in addition to this one.

12   Since we're sharing -- I have two specific to Ms. Garcia.

13         THE COURT:  Would be separate from the others?

14         MR. COLLUM:  They don't have any information on the

15   others.

16         THE COURT:  And how about you, Ms. Williams?

17         MS. WILLIAMS:  I'm not quite sure if they're going to

18   overlap, but we're going to share Ms. Newberry, and then I have

19   two more on my list.

20         THE COURT:  All right.  I think we're ready to proceed.

21   If you'll swear Ms. Newberry.

22      Ms. Newberry, if you'll stand to be sworn.

23         THE COURTROOM DEPUTY:  Raise your right hand.

24            THE WITNESS, CASEY NEWBERRY, IS SWORN

25         THE COURT:  All right.  Mr. Cadle?

Case 2:19-cr-00096-PP   Filed 06/04/24   Page 58 of 121   Document 11

May 24, 2019

DIRECT EXAMINATION

2   BY MR. CADLE:

3   Q.  Could you state your name for the record, please, ma'am?

4   A.  My name is Casey Newberry.

5   Q.  Okay.  And what is your relationship to the Garcia family,

6   Ms. Newberry?

7   A.  I have been dating Daniel Garcia for six years.  We have a

8   daughter together.  Now we have a son together.

9   Q.  What's your daughter's name?

10  A.  Kaylin (sp.) Garcia.

11  Q.  And how old is your daughter?

12  A.  Nineteen months.

13  Q.  Okay.  And you're pregnant at this time?

14  A.  Yes, sir, very pregnant.

15  Q.  Yes, ma'am.  When's your due date?

16  A.  My due date is June 18th, but we've, the doctors, we've

17  discussed being induced around the first week of June.

18  Q.  Okay.  And do you live with Mr. Daniel Garcia?

19  A.  I do.

20  Q.  Okay.  How long have you all lived together?

21  A.  Five years.

22  Q.  Okay.  And in the five years you've been living with

23  Mr. Garcia, can you tell us what you've observed about his

24  physical and mental condition?

25  A.  He's great.  I mean, his physical and mental condition is

May 24, 2019

1  fine.

2  Q.  Okay.  Do you have any reason to think he's a danger to this

3  community?

4  A.  No, sir, not at all.

5  Q.  Do you have any knowledge of any run-ins with the law

6  recently?

7  A.  No, sir.

8  Q.  Do you have any reason to think he'd harm anyone?

9  A.  No, not at all.

10  Q.  Okay.  And how is your relationship with him?

11  A.  Great.  (Inaudible)

12  Q.  What kind of -- are you all active in the community?

13  A.  Yes, sir.  Well, we do as much as we can.  I'm enrolled in

14  school right now for medical assisting.  I just got my

15  certification for nurse's aide.

16  Q.  Uh-huh.

17  A.  He's enrolled in school.  He currently has two degrees.

18  Working on a master's degree.

19  Q.  What's the master's degree he's working on?

20  A.  For business.

21  Q.  Okay.  And what are his two degrees?

22  A.  Bachelor of Science of business and a marketing degree.

23  Q.  Where did he get those degrees?

24  A.  Thomas University.

25  Q.  Okay.  And where is he working on his MBA?

Case 2:19-cr-00096-PP   Filed 06/04/24   Page 60 of 121   Document 11

May 24, 2019

1  A.  At Thomas University.

2  Q.  When does he finish his MBA?

3  A.  May, I believe.

4  Q.  Okay.  Does he do what people in authority tell him to do?

5  A.  Yes, sir.

6  Q.  Is he a person of his word?

7  A.  He is.

8  Q.  And if the judge ordered him to appear, do you have any

9  doubt he would appear?

10  A.  No.  He'd be here.

11  Q.  Okay.  Do you think he's a flight risk?

12  A.  I do not think so.

13  Q.  Do you know Mr. Saul Garcia, Sr., and Mr. Saul Garcia, Jr.?

14  A.  I do.

15  Q.  Okay.  I guess you've known them about as long as you've

16  known Daniel?

17  A.  Yeah.  Well, I actually met Daniel when I was ten, and I've

18  known Daniel for, you know, 17 years.  We've only been dating

19  for the last six years.

20  Q.  Okay.  Do you have any reason to think Mr. Saul Garcia, Sr.,

21  or Jr. are flight risks?

22  A.  No, sir.

23  Q.  Do you have any reason to think they'd be a danger to their

24  community?

25  A.  No.

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 63 of 121   Document 11

May 24, 2019

1          MR. CADLE:  All right.  No further questions, your

2   Honor.

3          THE COURT:  All right.  Anything, Mr. Collum?

4                    DIRECT EXAMINATION

5   BY MR. COLLUM:

6   Q.  Ms. Newberry, how long have you known Consuelo Garcia?

7   A.  For the same, about 17 years.  And I've been dating Daniel

8   for six, so.

9   Q.  But you know her by Connie?

10  A.  Yes, sir.

11  Q.  Okay.  So you've known Connie for 17 years?

12  A.  Yes, sir.

13  Q.  Okay.  Do you have any evidence at all that she would be a

14  flight risk?

15  A.  No.

16  Q.  All right.  Do you believe that she'd report for all court

17  appearances that are ordered?

18  A.  I know she would.

19  Q.  Okay.  And if the judge imposed any restrictions on her, do

20  you believe she would comply with those restrictions?

21  A.  Yes, sir.

22  Q.  Okay.  Do you believe she's a danger to the community at

23  all?

24  A.  Not at all.

25  Q.  All right.  Do you think she would try to intimidate any

May 24, 2019

1  witnesses or anything like that?

2  A.  No.

3  Q.  Okay.  And you've known her for 17 years, correct?

4  A.  Yes, sir.

5  Q.  All right.  And do you think she would try to flee the

6  country at all?

7  A.  No.

8      MR. COLLUM:  All right.  Thank you, your Honor.  No

9  further questions.

10     THE COURT:  Any of Ms. Williams for Ms. Garcia-Olalde?

11             DIRECT EXAMINATION

12 BY MS. WILLIAMS:

13 Q.  Ms. Newberry, how do you know Ms. Garcia-Olalde?

14 A.  She is Daniel's aunt and she is also the godmother of my

15 daughter.

16 Q.  And how long have you known her?

17 A.  Six years.

18 Q.  Okay.  And where does she live?

19 A.  She is a Mexico resident.

20 Q.  Uh-huh.

21 A.  But she comes with her work visa every year, you know, to

22 work.

23 Q.  And when you say she comes to work, where does she come to

24 work?

25 A.  She works wherever, I mean, wherever they need her to go

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 63 of 121   Document 11

May 24, 2019

1  into the fields.

2  Q.  Okay.  And where is she right now?

3  A.  Right now she's working, I believe, in Adel.  I mean, she's

4  here on her work visa.

5  Q.  Okay.  And you said that she is the godmother of your child;

6  is that correct?

7  A.  Yes, ma'am.

8  Q.  And how did you come to that decision?

9  A.  Well, she's a hard worker.  I know that if anything were to

10  happen to myself or Daniel, that she would take care of my

11  daughter.  Saul, Jr., is also my daughter's godfather for the

12  same reason.  You know, they're good people, hardworking people,

13  and I have no reason to not trust them, you know, for them to

14  take care of my child if anything were to happen to me.

15  Q.  So you did not make that decision to bestow that honor upon

16  her very lightly.

17  A.  Right, no.  It was not an easy decision to make, but I felt

18  that she was the best for that.

19  Q.  Okay.  And that's after having known her for six years.

20  A.  Yes, ma'am.

21  Q.  You decided that you would trust your daughter's life to

22  her.

23  A.  Yes, ma'am.

24  Q.  Now, have you ever seen her behave in a violent manner?

25  A.  No, ma'am, not at all.

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 64 of 121   Document 11

1 Q. Are you afraid of her?

2 A. Not at all.

3 Q. Do you believe her to be a danger to the community?

4 A. No, ma'am, not at all.

5 Q. Now, if she were given a bond, do you believe she would

6 appear in court?

7 A. Yes, ma'am, I know she would.

8 Q. Do you think she would be a flight risk?

9 A. Not at all.

10 Q. Now, you say that she lives in Mexico. Do you believe if

11 she were given a bond, that she would simply just return to

12 Mexico?

13 A. No, ma'am, I don't think she would do that.

14 Q. Okay. Now, you indicated that she goes wherever the work

15 is.

16 A. Uh-huh.

17 Q. Have you ever seen her go to work?

18 A. Well, I mean, I've seen her out there working, you know.

19 There have been instances where maybe we need to take ice or

20 more waters or, you know, anything like that. I've seen her

21 actually at work.

22 Q. Okay. So you do know what type of work she does and you've

23 seen her --

24 A. Yes, ma'am.

25 Q. -- doing that particular work? And what type of work is

Case 2:19-cr-00096-PP   Filed 06/09/94 03:09:65 of 121   Document 11
229-405-8893

May 24, 2019

1  that?

2  A.  Farm labor.

3  Q.  Okay.

4  A.  Working outside in the crops and fields.

5  Q.  And how long have you known her to do that type of work?

6  A.  For the six years that I've known her.

7  Q.  So the entire time you've known her, you've known her to do

8  farm type work.

9  A.  Yes, ma'am.

10 Q.  And when you say she'll go all over to do that type of work,

11 what different places have you known her to go and work?

12 A.  Well, I don't -- wherever they send, you know, ask her to

13 go, I know that she goes.  I don't know specifically where all

14 the places she's asked to go, but, you know, I know that she

15 goes where she's asked.

16         MS. WILLIAMS:  Okay.  And I have no further questions

17 of you.  Thank you.

18         THE COURT:  All right.  Mr. Crane, any cross?

19         MR. CRANE:  Yes, sir.

20                    CROSS EXAMINATION

21 BY MR. CRANE:

22 Q.  Good morning, ma'am.

23 A.  Good morning.

24 Q.  All of the Garcias, all five of them, have substantial ties

25 to Mexico, correct?

Case 2:19-cr-00096-PP   Filed 06/04/24   Page 66 of 121   Document 11
229-405-8898

May 24, 2019

1    A.  Yes, sir.

2    Q.  And the four men are all naturalized United States citizens;

3    is that correct?

4    A.  The four men?

5    Q.  The four gentlemen?  The Garcias?

6         THE COURT:  I think she's hesitating because --

7         THE WITNESS:  There's three.

8    BY MR. CRANE:

9    Q.  Three.

10   A.  Yes, sir.

11   Q.  Three Garcias.  Excuse me.  The three Garcia gentlemen.

12   A.  I'm sorry.  What was the question?

13   Q.  All born in Mexico but became naturalized U.S. citizens.

14   A.  No, sir, that's not true.  They were born here.

15   Q.  Okay.  They were born here?

16   A.  Yes, sir.  Well, the two were.  Daniel and Saul, Jr., were.

17   Q.  Were born here.

18   A.  Yes, sir.

19   Q.  Okay.  Saul, Sr., born in Mexico.

20   A.  I believe so, yes, sir.

21   Q.  Okay.  And Consuelo?

22   A.  I believe born in Mexico.

23   Q.  All right.  But they all have substantial ties to Mexico.

24   A.  Sure.  Yes, sir.

25   Q.  And travel there frequently.

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 67 of 121   Document 11

May 24, 2019

1 A.  I wouldn't say frequently.  They've been, what, once in the
2 last five, six years?
3 Q.  Would it surprise you that they've been multiple times?
4 A.  Yeah, that would surprise me.
5 Q.  And I take it, I would not expect you have, but to have
6 reviewed records of the Department of Homeland Security of their
7 exit and entry into the country?
8 A.  I'm sorry.  What was the question?
9 Q.  You haven't had a chance to review records from the
10 Department of Homeland Security of their exit and then reentry
11 into the country.
12 A.  No, sir.
13 Q.  When was the last time Daniel Garcia went to Mexico?
14 A.  February, with my daughter.
15 Q.  Of this year.
16 A.  Yes, sir.
17 Q.  And before that, he went in 2014?
18 A.  Yes, sir.
19 Q.  All right.  And are you aware of what penalties they may
20 face if convicted?
21 A.  No, sir.
22 Q.  Now, you responded that Ms. Maria Remedios Garcia, I believe
23 you stated, travels all over with the farm workers, something to
24 that effect?
25 A.  Something -- yes, sir.  She goes where she's asked to go

Case 2:19-cr-00096-PP   Filed 06/04/24   Page 68 of 121   Document 11

May 24, 2019

1  work.

2  Q.  Including Wisconsin?

3  A.  Yes, sir.

4  Q.  And your husband has gone to Wisconsin on some numerous

5  occasions, correct?

6  A.  No, sir.

7  Q.  How many occasions?

8  A.  Well, once, I believe?

9       MR. CRANE:  Okay.  Thank you.

10      That's all I have, your Honor.

11      THE COURT:  Any redirect, Ms. Cadle -- Mr. Cadle?

12      MR. CADLE:  No, your Honor.

13      THE COURT:  Mr. Collum?

14      MR. COLLUM:  No, your Honor.

15      THE COURT:  Ms. Williams?

16      MS. WILLIAMS:  No, your Honor.

17      THE COURT:  All right.  Just for clarity, Ms. Newberry,

18  you were asked about your husband.  You and Mr. Garcia are not

19  married.

20      THE WITNESS:  We are not married, no, sir.

21      THE COURT:  All right.  Thank you, ma'am.

22      Any objection to Ms. Newberry being excused?

23      MR. COLLUM:  No, your Honor.

24      MR. CADLE:  No, your Honor.

25      MS. WILLIAMS:  No, your Honor.

Case 2:19-cr-00096-PP   Filed 06/04/24   229-405-6898 Page 69 of 121   Document 11

1          MR. CRANE:  No, your Honor.

2          THE COURT:  All right.  You're excused, Ms. Newberry.

3     Thank you, ma'am.

4          Mr. Cadle, what I'm thinking is the Court could hear from

5     one or two more of witnesses along these same lines.  Now, if

6     you tell me somebody's unique and not cumulative to what I've

7     been hearing, then I'll hear from you, but I'm thinking one or

8     two, and then I'll let you proffer to what the others -- I know

9     you've got other witnesses, and you can proffer what they would

10    say if I had let you put them on.

11         MR. CADLE:  Yes, your Honor.  I've got Rebecca Clark is

12    my next witness, your Honor.

13         THE COURT:  All right.

14         MR. COLLUM:  Your Honor, according to Mr. Cadle, I

15    believe Ms. Rebecca Clark will be his last witness.  I'll only

16    have two.  And they'll be brief.  And Ms. Williams will have

17    two.  So really, at the outset, we've got five, your Honor.

18    We'll be quick.

19         THE COURT:  All right.  Thank you, Mr. Collum.

20    All right.

21    You may call Ms. Clark.

22         THE COURTROOM DEPUTY:  Raise your right hand.

23          THE WITNESS, REBECCA ALICE CLARK, IS SWORN

24         THE COURT:  Thank you, Ms. Clark.  I know it's a little

25    unusual.  Stand up and raise your hand is not something you do

Case 2:19-cr-00096-PP   Filed 06/04/24   Page 70 of 121   Document 11

May 24, 2019

```
1   every day.  You may have a seat now.  And adjust that microphone
2   so we can all hear you.  And there will be several lawyers who
3   want to ask you some questions.
4       All right.  Mr. Cadle?
5                        DIRECT EXAMINATION
6   BY MR. CADLE:
7   Q.  Could you state your name for the record, please, ma'am.
8   A.  Yes.  Rebecca Alice Clark.
9   Q.  Okay.  Ms. Clark, what is your relationship to any of the
10  Garcia gentlemen seated here?
11  A.  I am his girlfriend.
12  Q.  Okay.  Which one?
13  A.  Saul, Jr.  Sorry.
14  Q.  Thank you.  How long have you known Saul, Jr.?
15  A.  Fifteen years.
16  Q.  Okay.  And how long have you been together?
17  A.  Going on two years.
18  Q.  Okay.  And where are you from?
19  A.  Moultrie, Georgia.
20  Q.  Okay.  And are you in school, or have you been to school?
21  A.  Yes, sir.  So I have my bachelor's in psychology, and then I
22  am in a doctorial program for clinical medical psychology at
23  Mercer University.
24  Q.  How far along are you?
25  A.  I'm in my third year.  It's a five-year program.
```

Case 2:19-cr-00096-PP   Filed 06/04/24   Page 73 of 121   Document 11

May 24, 2019

1   Q.  All right.  And where do you live now?

2   A.  I live in Roswell, Georgia, and I commute to Moultrie,

3   Georgia, where I live on the weekends.

4   Q.  Okay.  Got you.  And could you tell the Court, have you had

5   an opportunity to observe the kind of physical and mental

6   condition of Mr. Garcia, Jr.?

7   A.  I have.

8   Q.  Okay.  And can you tell the Court what you've observed?

9   A.  Yes.  He's a very stable gentleman, a hard worker.  He gets

10  up bright and early in the morning.  Comes home, you know,

11  sometimes late at night.  And, yeah, he's a hard worker.

12  Honest.  Very good man.

13  Q.  Do you all have any children together?

14  A.  Currently pregnant, fourteen weeks, our first child.

15  Q.  And do you have any reason to think Mr. Garcia, Jr., is a

16  danger to his community?

17  A.  Definitely not.

18  Q.  All right.  And based on what you've observed, does he have

19  any history of alcohol or drug abuse?

20  A.  No, sir, not that I've observed.

21  Q.  Okay.  And what kind of family ties does he have to this

22  area?

23  A.  Like such as in the community?

24  Q.  Yes, ma'am.

25  A.  Well, everybody knows him in the community.  He's well

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 72 of 121   Document 11

May 24, 2019

1  liked, well respected, has plenty of friends.

2  Q.  Okay.  Do you think he would harm anyone?

3  A.  No.

4  Q.  Do you think he would obstruct any witnesses in this case if

5  he were released?

6  A.  No, sir.

7  Q.  Do you think he would do what the Court tells him to do and

8  reappear if he was so ordered?

9  A.  Yes, sir.

10  Q.  Do you think he would meet any conditions that were applied

11  to him by the Court for his --

12  A.  Yes, sir.

13  Q.  -- release?  Is he a man of his word?

14  A.  Yes, sir.

15  Q.  Do you think he's a flight risk?

16  A.  No, sir.

17  Q.  Do you think he would go back to Mexico, or would he face

18  the charges here in court against him?

19  A.  He would face the charges here in court against him.

20        MR. CADLE:  No further questions, your Honor.

21        THE COURT:  All right.  Mr. Collum for Consuelo.

22                   DIRECT EXAMINATION

23  BY MR. COLLUM:

24  Q.  Ms. Clark, do you know Consuelo Garcia?

25  A.  Yes, sir, I do.

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 73 of 121   Document 11

May 24, 2019

 1  Q.  You know her as Connie?

 2  A.  Yes.

 3  Q.  How many years have you known her?

 4  A.  As long as Saul, Jr., 15 years.  The whole family, I've

 5  known them that long.

 6  Q.  Do you believe that she is a flight risk?

 7  A.  No, sir.

 8  Q.  Do you believe she would try to intimidate any witnesses or

 9  obstruct justice?

10  A.  No, sir.

11  Q.  Do you believe that she would appear for all court

12  appearances?

13  A.  Yes, sir, I do.

14  Q.  And any restrictions that the Court would place upon her,

15  would she follow those restrictions?

16  A.  Yes, sir.

17          MR. COLLUM:  No further questions, your Honor.

18          THE COURT:  And Ms. Williams for Ms. Garcia-Olalde.

19          MS. WILLIAMS:  No questions of this witness.

20          THE COURT:  All right.  Mr. Crane, any cross?

21          MR. CRANE:  No, your Honor.

22          THE COURT:  All right, Ms. Clark.  Thank you very much.

23          THE WITNESS:  Thank you.

24          THE COURT:  You may step down.

25      Any objection to Ms. Clark being excused?

Case 2:19-cr-00096-PP   Filed 06/24/19   Page 74 of 121   Document 11
229-403-6810

May 24, 2019

1      MR. CADLE:  No objection, your Honor.

2      MR. COLLUM:  No, your Honor.

3      MR. CRANE:  No.

4      THE COURT:  All right.  You're excused, Ms. Clark.

5   All right.  Mr. Cadle, do you want call another one?

6      MR. CADLE:  No, your Honor.

7      THE COURT:  All right.  Would you like to, you know --

8      MR. CADLE:  I would like to talk --

9      THE COURT:  Yes, I'll give you an opportunity at this

10  time to close out on behalf of these three defendants that

11  you're representing, the evidence, by making a proffer.  And

12  you're welcome to tell me what these other people would have

13  said.

14     MR. CADLE:  And, in summary, your Honor, Mr. McCants

15  Plymel and Mr. Josh Nuñez would have been called.  They are both

16  life-long friends of the Garcias.  They would testify that they

17  have known the younger Garcias for years and in the same time

18  that they have known Saul, Sr.  They would testify that these

19  gentlemen are not a danger to their community, that they're

20  people of their word, and that they would fulfill the conditions

21  of their bond, that they will not tamper with any witnesses, and

22  that they would not be a flight risk.

23   I've got one more, your Honor.  I've got a proffer from a

24  Mr. Tim Moore of Moore Farms.  This is a written proffer.  And

25  we could just enter it with the Court in written form.

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 75 of 121   Document 11

May 24, 2019

1          THE COURT:  So it's a statement from Mr. Moore.

2          MR. CADLE:  Yes, sir.

3          THE COURT:  Have you published it to the government?

4          MR. CADLE:  I've already showed it to the government,

5     your Honor.

6          THE COURT:  All right.  Why don't you mark it as

7     Defendant's 1 and move to introduce it.  And we'll see what the

8     government says.

9          MR. CADLE:  Your Honor, I would mark the written

10    statement from Mr. Tim Moore as Defendant's 1 and move to

11    introduce it.

12         THE COURT:  Any objection?

13         MR. CRANE:  No objection, your Honor.

14         THE COURT:  All right.  So defendant Saul Garcia, Sr.,

15    and Jr. and Daniel Garcia's Number 1 is admitted.  You can pass

16    that up.

17    (Defendants Saul Garcia, Sr., Saul Garcia, Jr., and Daniel

18    Garcia's Exhibit No. 1 received in evidence)

19         THE COURT:  All right.  So, Mr. Cadle, anything further

20    on behalf of Daniel Garcia, Saul Garcia, Sr., or Saul Garcia,

21    Jr.?

22         MR. CADLE:  No, your Honor.

23         THE COURT:  All right.  Thank you, sir.

24    So we move to Consuelo Garcia.  And, Mr. Collum, any

25    witnesses on her behalf?

Case 2:19-cr-00096-PP   Filed 06/09/19  Page 76 of 121   Document 11

May 24, 2019

```
1              MR. COLLUM:  Yes, your Honor, two.

2              THE COURTROOM DEPUTY:  Raise your right hand.

3                 THE WITNESS, JUDY BURNHAM, IS SWORN

4              THE COURT:  Good morning, ma'am.  You may sit down.

5    And Mr. Collum will ask you some questions.

6         All right.  Mr. Collum?

7                        DIRECT EXAMINATION

8    BY MR. COLLUM:

9    Q.  State your name for the record, please.

10   A.  Judy Burnham.

11   Q.  How are you employed?

12   A.  I'm a real estate agent.

13   Q.  Where are you located?

14   A.  Moultrie, Georgia.

15   Q.  Okay.  And how long have you done that?

16   A.  Real estate?

17   Q.  Uh-huh.

18   A.  Since 2008.

19   Q.  2008.  Do you know Consuelo Garcia?

20   A.  I do.

21   Q.  Also known as Connie?

22   A.  Uh-huh.

23   Q.  All right.  How long have you known her?

24   A.  Since 2008.

25   Q.  Okay.
```

Case 2:19-cr-00096-PP   Filed 06/24/19   Page 78 of 121   Document 11

May 24, 2019

1  A.  About ten years.

2  Q.  Okay.  Now, is she a woman of good character in your

3  opinion?

4  A.  Absolutely.

5  Q.  Okay.  Is she involved in the community?

6  A.  Yes.

7  Q.  All right.  Do you have any reason to believe that she would

8  be a threat to the community?

9  A.  Absolutely not.

10  Q.  Okay.  Do you think that she would try to intimidate any

11  witnesses in this case?

12  A.  No.

13  Q.  Try to obstruct justice?

14  A.  No.

15  Q.  Okay.  Do you think that she would try to flee the district?

16  A.  No.

17  Q.  Do you think she'd try to go to Mexico to avoid these

18  charges?

19  A.  No.

20  Q.  Okay.  Do you believe that she would appear for all court

21  appearances?

22  A.  I do.

23  Q.  And if the judge imposed any restrictions on her, do you

24  believe that she would follow those restrictions?

25  A.  Yes, sir.

May 24, 2019

1  Q.  Okay.  So just to recap, she's not a danger to the

2  community, correct?

3  A.  She's an asset to the community.

4  Q.  An asset.  Well, tell us about that.  How is she an asset to

5  the community?

6  A.  She gives from her heart.  For instance, let me just share

7  something with you.  One of other agents, one time, going

8  through cancer, medical.  And she was the treasurer for the

9  Board of Realtors -- I was the treasurer.  I'm sorry.  I'm

10  nervous here.  I was the treasurer for the Board of Realtors,

11  and she gave, anonymously, I knew that it was from her, she

12  gave, because that other Realtor had cancer and he didn't have

13  the money to pay his dues, so he could keep working the best

14  that he could.

15       She supports autism.  She's godparents to people.  She's

16  adopted a child that was not blood.  She just gives

17  wholeheartedly.  She gives anonymously because she don't want to

18  be spouting out, oh, I can do this, I can do that.  No.  She

19  gives from the heart.

20  Q.  Would you say she has substantial ties to the community?

21  A.  Yes.

22  Q.  She owns a number of properties in the community?

23  A.  Yes, sir.

24  Q.  She has business responsibilities in the community?

25  A.  Yes, sir.

May 24, 2019

1        MR. COLLUM:  All right.  No further questions, your

2   Honor.

3        THE COURT:  All right, any questions, Mr. Cadle?

4        MR. CADLE:  No, your Honor.

5        THE COURT:  Ms. Williams?

6        MS. WILLIAMS:  No, your Honor.

7        THE COURT:  Cross examination, Mr. Crane?

8        MR. CRANE:  Just briefly.

9                    CROSS EXAMINATION

10  BY MR. CRANE:

11  Q.  Are you aware of Ms. Consuelo Garcia sending workers to

12  Wisconsin under false pretenses?

13  A.  No, sir.

14  Q.  Do you have any idea about how she runs her business

15  affairs?

16  A.  No.

17  Q.  Whether those are honest or dishonest.

18  A.  If she does anything, to my knowledge, it would be about

19  honesty.

20  Q.  Well, my question is, do you know how those workers got sent

21  to Wisconsin?

22  A.  No.

23  Q.  Did she create fraudulent green cards for them?

24  A.  Not that I'm aware of because I'm not a part of that.

25  Q.  Okay.  So you simply have no knowledge.

Case 2:19-cr-00096-PP   Filed 06/24/19   Page 80 of 121   Document 11

May 24, 2019

1    A.  No, but I don't think she would do anything like that.  I

2    don't think the whole family would do anything like that.

3         MR. CRANE:  Very well.  Thank you.

4         THE COURT:  Any redirect, Mr. Collum?

5         MR. COLLUM:  No, your Honor.

6         THE COURT:  Thank you, Ms. Burnham.

7    Any objection to Ms. Burnham being excused?

8         MR. COLLUM:  No, your Honor.

9         MR. CRANE:  No, your Honor.

10        THE COURT:  All right.  You're excused, Ms. Burnham.

11   Thank you for being here this morning.

12        All right, Mr. Collum, you may call your next witness for

13   Consuelo Garcia.  Now, what's this witness's name, Mr. Collum?

14        MR. COLLUM:  Mike Parton.

15        THE COURT:  Parton?

16        MR. COLLUM:  Parton, yes, sir.

17        THE COURT:  Parton.

18        Good morning, Mr. Parton.  We're going to swear you in, and

19   then the lawyers will ask you some questions.  If you'll raise

20   your right hand, Mr. Lawrence will give you the oath.

21             THE WITNESS, MICHAEL PARTON, IS SWORN

22        THE COURT:  All right.  Thank you, sir.  And if you'll

23   just scoot up best you can to that microphone so everybody can

24   hear you.

25        All right.  Mr. Collum?

Case 2:19-cr-00096-PP   Filed 06/04/24   Page 88 of 121   Document 11

May 24, 2019

| 1 | DIRECT EXAMINATION |
| 2 | BY MR. COLLUM: |
| 3 | Q.  Will you please state your name for the record? |
| 4 | A.  Michael Parton. |
| 5 | Q.  And how are you employed? |
| 6 | A.  I'm self-employed.  I own a real estate company, Landmark |
| 7 | Realty, in Moultrie, Georgia. |
| 8 | Q.  And how long have you done that job? |
| 9 | A.  I've had my license since 1990, 29 years. |
| 10 | Q.  Okay.  And do you know Consuelo Garcia? |
| 11 | A.  Yes. |
| 12 | Q.  Do you know her as Connie? |
| 13 | A.  Yes, I know her as Connie. |
| 14 | Q.  How long have you known Connie Garcia? |
| 15 | A.  About 11 years, ten or 11 years. |
| 16 | Q.  And have you all worked together? |
| 17 | A.  Yes. |
| 18 | Q.  And you've worked together for 11 years, correct, sir? |
| 19 | A.  Well, we were competitors for the first four.  And then she |
| 20 | come to work for me in 2015. |
| 21 | Q.  So you thought enough of her to hire her? |
| 22 | A.  Yes. |
| 23 | Q.  All right.  Now, over the last 11 years that you've known |
| 24 | her, do you believe that she is an asset to the community? |
| 25 | A.  Definitely. |

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 82 of 121   Document 11

May 24, 2019

1  Q.  Okay.  Do you believe that she's a danger to the community?

2  A.  No, sir, not whatsoever.

3  Q.  Do you believe that she would try to intimidate any

4  witnesses in this case?

5  A.  No, sir.

6  Q.  Do you believe that she'd try to obstruct justice in this

7  case?

8  A.  No, sir, not Connie.

9  Q.  Do you think she would try to flee the country to avoid

10  these charges?

11  A.  No, sir.

12  Q.  Do you think she would appear for all court appearances

13  mandated by the Court?

14  A.  Yes, I do.

15  Q.  And if the Court imposed any restrictions on her, do you

16  believe that she would comply with all those restriction?

17  A.  Yes, I do.

18          MR. COLLUM:  All right.  No further questions, your

19  Honor.

20          THE COURT:  All right.  Anything, Mr. Cadle, on behalf

21  of your three clients?

22          MR. CADLE:  No, your Honor.

23          THE COURT:  Ms. Williams?

24          MS. WILLIAMS:  No, your Honor.

25          THE COURT:  Any cross examination?

Case 2:19-cr-00096-PP    Filed 06/04/19    Page 83 of 121    Document 11
229-405-6818

May 24, 2019

1          MR. CRANE:  No, your Honor.

2          THE COURT:  All right.  Any objection to this witness

3    being excused?

4          MR. COLLUM:  No, your Honor.

5          MR. CRANE:  No --

6          THE COURT:  All right.  Thank you, Mr. Parton.  You may

7    step down.  And you are excused.  Thank you, sir, for being

8    here.

9          MR. COLLUM:  Your Honor, by proffer, I'd like to just

10   mention a couple of witnesses if possible.  Josh Nuñez,

11   Mr. Cadle's already mentioned him.  He would basically say the

12   same thing for Ms. Garcia that was proffered on behalf of the

13   Garcia men in this case.

14       Also, your Honor, Kelly Torres.  She would state, your

15   Honor, that Ms. Consuelo Garcia is a valued member of the

16   community, she's not a flight risk, that she would not be a

17   danger to the community.  She would not try to intimidate any

18   witnesses or obstruct justice, and she would follow all

19   restrictions, make all court appearances.

20       That's all we have for Ms. Consuelo Garcia, your Honor.

21         THE COURT:  All right.  Thank you, Mr. Collum.

22       All right, Ms. Williams, that moves us to Ms. Maria

23   Garcia-Olalde.

24         MS. WILLIAMS:  Okay.  Our first witness will be Kelly

25   Torres.  Kelly.

Case 2:19-cr-00096-PP   Filed 06/04/20   Page 84 of 121   Document 11
229-403-6818

May 24, 2019

1           THE WITNESS, KELLY NAOMI TORRES, IS SWORN

2           THE COURT:  Good morning, Ms. Torres.

3           THE WITNESS:  Good morning.

4           THE COURT:  Welcome.  Relax.  If you'll sit down and

5    just get yourself comfortable in front of that microphone so

6    everybody can hear what you say.

7       Mr. Cadle, I think we left some witnesses outside.  It's

8    fine with the Court if you invite them in or have somebody --

9    they're welcome to hear we're not going to make them take the

10   stand today.

11      All right.  Ms. Williams?

12                      DIRECT EXAMINATION

13   BY MS. WILLIAMS:

14   Q.  Would you state your name for the record, please.

15   A.  Kelly Naomi Torres.

16   Q.  Ms. Torres, how do you know my client, Maria Garcia-Olalde?

17   A.  She is the great aunt to my son Raymond Garcia, Jr.

18   Q.  And how long have you known her?

19   A.  Since 2005.

20   Q.  Okay.

21   A.  2015, I'm sorry.

22   Q.  2015?

23          THE COURT:  One minute, Ms. Williams.  I want to make

24   sure we're all on the same page.  I didn't want one of your

25   witnesses to come in that you're about to call.  Thank you.

May 24, 2019

1  Sorry about that.

2          MS. WILLIAMS:  No problem.

3          THE COURT:  All right.  Go ahead.

4  BY MS. WILLIAMS:

5  Q.  So you have known her since 2015.

6  A.  Yes, ma'am.

7  Q.  And you said she is the great aunt.  So she's kind of like

8  family to you.

9  A.  Yes.

10 Q.  And how often do you see her?

11 A.  I see her usually around like when we do family events and

12 stuff.

13 Q.  And do you consider her a family member?

14 A.  Yes.

15 Q.  And can you describe her character or her temperament?

16 A.  She's a very hard worker.  She, she expresses herself real

17 good.  She's a great lady.  Has all my respect.  She's really

18 respectful.

19 Q.  Okay.  And when you say she's a hard worker, how do you know

20 that about her?

21 A.  From, like, the guys.  And I know she works nine -- from,

22 like, early rise to late night.  And, I mean, she's just, from

23 what I hear and see, she's always at work on time.

24 Q.  Okay.  And then you also said that she is very respectful.

25 A.  (No audible answer)

May 24, 2019

1   Q.  What type of interaction have you had with her personally?

2   A.  We always, like at family events, she always talks to me and

3   she's always, like, respectful as in my religion.  We don't

4   share the same religion.  And she's always talked to me about,

5   you know, she respects my religion and I respect hers.  She

6   tells me about her religion and all the differences between ours

7   and, you know, just telling me the good things about one

8   another.

9   Q.  Right.  Now, have you ever seen her behave in a violent

10  manner?

11  A.  No, ma'am.

12  Q.  Are you afraid of her?

13  A.  No, ma'am.

14  Q.  Now, you say you see her at family events.  What type of

15  family events?

16  A.  Like when she's down for, like, Thanksgiving.

17  Q.  Uh-huh.

18  A.  Christmas or our kids' baptism.  She was the godmother to my

19  niece.

20  Q.  Okay.  And have you ever seen her and you thought that she

21  was intoxicated?

22  A.  No.

23  Q.  Have you ever seen her disrespect anyone?

24  A.  No.

25  Q.  Now, if she were given a bond, do you think she would return

Case 2:19-cr-00096-PP   Filed 06/04/24   Page 88 of 121   Document 11

1  to court?

2  A.  Yes.

3  Q.  Do you believe she would comply with the Court's

4  instructions if given conditions for a bond?

5  A.  Yes.

6        MS. WILLIAMS:  No further questions of this witness.

7  Thank you.  Somebody else, someone else may have questions for

8  you.  Wait, wait.

9        THE COURT:  Mr. Cadle, anything for this witness?

10       MR. CADLE:  No, your Honor.

11       THE COURT:  Mr. Collum?

12       MR. COLLUM:  Your Honor, I've already proffered what

13  she would testify to, so I don't see any need to ask her

14  questions.

15       THE COURT:  All right.  Fair enough.

16     And any cross examination, Mr. Crane?

17       MR. CRANE:  Just briefly.

18                    CROSS EXAMINATION

19  BY MR. CRANE:

20  Q.  Are you aware that Maria Garcia traveled to Wisconsin with

21  migrant laborers?

22  A.  No.

23  Q.  Do you have any knowledge about what she did up there?

24  A.  No.

25  Q.  Or how those workers got there or how they were brought

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 88 of 121   Document 11

May 24, 2019

1  back?

2  A.  No.

3      MR. CRANE:  Thank you.

4      THE COURT:  May she step down, Ms. Williams?

5      MS. WILLIAMS:  Yes, your Honor.

6      THE COURT:  All right.  Any objection to Ms. Torres

7  being excused?

8      MR. CADLE:  No, your Honor.

9      MR. COLLUM:  No, your Honor.

10     MS. WILLIAMS:  No, your Honor.

11     MR. CRANE:  No, your Honor.

12     THE COURT:  Ms. Torres is excused.  Thank you, ma'am.

13  Appreciate you being here.

14     You may call your next witness, Ms. Williams.

15     MS. WILLIAMS:  Rosita Senaseros.

16     THE COURT:  What was that last name?

17     MS. WILLIAMS:  Senaseros.

18     THE WITNESS:  Senaseros.

19     THE COURT:  All right.  Good afternoon, ma'am -- good

20  morning, ma'am.  Sorry to make you come in and go back out

21  again.  If you'll keep standing for a minute, and we're going to

22  put you under oath.  If you'll raise your right hand to

23  Mr. Lawrence right here.

24         THE WITNESS, ROSITA SENASEROS, IS SWORN

25     THE COURT:  All right.  Now you may be seated.  And get

May 24, 2019

1    that microphone comfortable for you so you can speak up and

2    everybody can hear you.  And there will be some lawyers that

3    will ask you a few questions.

4        All right.  Ms. Williams?

5                        DIRECT EXAMINATION

6    BY MS. WILLIAMS:

7    Q.  Would you state your name, please?

8    A.  My name is Rosita Senaseros.

9    Q.  Okay.  And how do you know Ms. Maria Garcia-Olalde?

10   A.  I have known her for the past five years.

11   Q.  Okay.  And what is your relationship to her?

12   A.  I had worked with her, and I have been around her within

13   family.

14   Q.  Okay.  And when you say you've worked with her, where have

15   you worked with her?

16   A.  C&D Harvesting.

17   Q.  Okay.  And when you were working with her, what type of work

18   did she do?

19   A.  Fieldwork.

20   Q.  Okay.  And what type of work were you doing?

21   A.  Fieldwork also.

22   Q.  Okay.  And how long ago was that?

23   A.  Four years ago?

24   Q.  Okay.  Okay.  And then after having worked there, you said

25   you would see her with family; is that right?

Case 2:19-cr-00096-PP   Filed 06/24/94   Page 90 of 121   Document 11

May 24, 2019

1    A.  Yes, ma'am.

2    Q.  Got you.  And can you describe her character, having seen

3    her around family?

4    A.  She's an amazing person.  She treats every people like she

5    knows everybody.  She's, she gets comfortable whenever she talks

6    to people, like she knows them.  She's really -- can I get her

7    to translate?

8             MS. WILLIAMS:  Sure.

9             THE WITNESS:  (Speaking in Spanish)

10            THE INTERPRETER:  Humble.

11            THE WITNESS:  Yes, really humble.

12   BY MS. WILLIAMS:

13   Q.  Gotcha.  Now, you said that you have been around her with

14   the family.  And what family are you referring to?

15   A.  The Garcia family.

16   Q.  Okay.  And what type of family events would you have been

17   with her?

18   A.  Birthdays.  Any events that they would make in family, I

19   would attend to them.

20   Q.  Okay.  Now, are you afraid of Ms. Garcia-Olalde?

21   A.  Absolutely not.

22   Q.  Have you ever seen her behave in a violent nature?

23   A.  Absolutely not.

24   Q.  Have you ever seen her and believe that she may have been

25   under the influence of drugs or alcohol?

Case 2:19-cr-00096-PP   Filed 06/04/24   Page 93 of 121   Document 11

May 24, 2019

1  A.  Absolutely not.

2  Q.  Have you ever seen her with a gun or anything of that

3  nature?

4  A.  Absolutely not.

5  Q.  If she were given a bond, do you believe she would appear in

6  court?

7  A.  Yes, ma'am.

8  Q.  If the Court were to give her conditions of a bond, do you

9  think she would follow those conditions?

10  A.  I'm pretty sure she will.

11  Q.  And what makes you believe that?  What have you seen in

12  terms of her character that makes you think she would follow

13  conditions of a bond?

14  A.  She's really responsible.  And we set up times and events

15  and she's always there on time, will always be there early to

16  help out.

17        MS. WILLIAMS:  Okay.  No further questions of this

18  witness.

19        THE COURT:  Anything from you, Mr. Cadle?

20        MR. CADLE:  No, your Honor.

21        THE COURT:  Mr. Collum?

22        MR. COLLUM:  No, your Honor.

23        THE COURT:  Any cross, Mr. Crane?

24        MR. CRANE:  No, your Honor.

25        THE COURT:  Any objection to this witness being

Case 2:19-cr-00096-PP   Filed 06/10/19   Page 92 of 121   Document 11

1  excused?

2          MS. WILLIAMS:  No, your Honor.

3          MR. CRANE:  No, your Honor.

4          MR. COLLUM:  No, your Honor.

5          THE COURT:  Thank you, ma'am.  You're excused, which

6  means you can leave or you can remain in the courtroom, your

7  pleasure.

8      All right, Ms. Williams, anything further on behalf of

9  Ms. Maria Garcia-Olalde?

10          MS. WILLIAMS:  No, your Honor.  We're just going to

11  rely on the Pretrial Services Report and our closing argument.

12  As you said, you're going to take that into consideration.

13          THE COURT:  All right.  Any rebuttal from the

14  government?

15          MR. CRANE:  No, your Honor.

16          THE COURT:  All right.  So the evidence is closed and

17  that's going to take us to closing remarks.  The government has

18  the burden.  Do you want to reserve, Mr. Crane?

19          MR. CRANE:  Yes, please.

20          THE COURT:  All right.  So we'll go in the order we've

21  been going.

22      So, Mr. Cadle, you may start off making closing remarks.

23      I'll remind counsel that of course the Court will consider

24  what's in the pretrial services reports, so you don't need to

25  read it.  But if you feel like there are things you want to

Case 2:19-cr-00096-PP   Filed 06/04/94  Page 93 of 121   Document 11
229-405-6818

May 24, 2019

1    point out, you're welcome to.

2        And, Mr. Cadle, you may close on behalf of Daniel Garcia,

3    Saul Garcia, Sr., and Saul Garcia, Jr.

4        MR. CADLE:  Thank you, your Honor.  I'm going to

5    attempt to be brief.  The Court has heard from many different

6    people from many different walks of life who interact with my

7    clients day-to-day.

8        I think as the Court reviews the reports, you will note that

9    these gentlemen may have had some run-ins with the law in the

10   past.  I would note that it appears, by everything that's been

11   presented to me and to the Court today, that they stood and

12   answered for any of those charges that were made.  So these

13   gentlemen have a history of showing up if they have to answer

14   for something.  There's no, what I would consider, recent

15   history.  And so though there is some history there, these

16   gentlemen came, and they showed up for their charges.

17       While there is travel history back and forth to Mexico,

18   again, these gentlemen have known about -- those other charges,

19   they answered for them.  And they've known that this

20   investigation was ongoing for what I understand to be

21   approximately four years.  And they have literally gone and come

22   to and from Mexico and came back to the United States.  Had they

23   wanted to flee, they well would have had an opportunity to flee.

24       We heard Mr. Garcia, Sr., has a substantial business

25   operation here.  Though he was born in Mexico, he is a U.S.

May 24, 2019

1  citizen.  That substantial business operation and who he is has

2  created strong ties to the community.  And there has been,

3  really, no evidence that he is a flight risk other than the

4  claims by the government, using strong language like slavery and

5  whatnot, to try and cast some kind of aspersion on this

6  gentleman's character that I think the evidence otherwise has

7  been very plain that has been presented today.

8      Mr. Garcia, Jr., has attended college.  He was born in the

9  United States.  He has a longtime girlfriend.  Again, he has

10  some charges in the past that he stood good for and he answered.

11  And he's here today.  And I think that the evidence has shown

12  that he will answer for those charges.

13      Same thing with Mr. Daniel Garcia.  He's got a small child.

14  Both of these young men have children on the way.  Mr. Daniel

15  Garcia, the birth of his child is fairly imminent.  Born in the

16  United States, both of these sons were college educated and are

17  continuing their education.

18      And so we would ask the Court to consider the considerable

19  pile of evidence before it that sets forth that the Court can

20  set conditions that are going to reasonably assure that these

21  gentlemen are going to appear and that the community, they pose

22  no danger to the community.  With that, I rest.

23          THE COURT:  All right.  Thank you, Mr. Cadle.

24      And Mr. Collum on behalf of Consuelo Garcia.

25          MR. COLLUM:  Your Honor, there were one, two, three,

Case 2:19-cr-00096-PP   Filed 06/04/24   Page 95 of 121   Document 11

May 24, 2019

1    four, five, six live witnesses and two proffers attesting to

2    Ms. Garcia's ability to be an asset to the community, not a

3    flight risk, not a danger to the community in any way or to

4    obstruct justice or to intimidate any witnesses and to follow

5    all restrictions imposed by the Court and is going to appear for

6    all court appearances.

7        Your Honor, there was testimony on the stand that not only

8    is Ms. Garcia an asset to the community, she has an adopted son

9    she takes care of, a minor son.  She also donated funds to help

10   out a cancer patient, paid dues so he could continue to work.

11       There has been no derogatory testimony, your Honor, at all

12   regarding my client in regards to what would be relevant to bond

13   in this case.  She has substantial ties to the community.

14   That's evident in the bail services report, your Honor.

15       There are conditions upon which she can be released that

16   would ensure her appearance at any court appearances, your

17   Honor.  I feel that we've rebutted the presumption for

18   detention.  And with that, your Honor, Ms. Garcia rests.

19           THE COURT:  Thank you, Mr. Collum.

20       And Ms. Williams on behalf of Ms. Maria Garcia-Olalde.

21           MS. WILLIAMS:  We understand that these charges are

22   serious and that the government does have a rebuttable

23   presumption in this situation.  However, we will submit that we

24   have presented some evidence with respect to dangerousness and

25   risk of flight to overcome such a presumption.

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 96 of 121   Document 11

1       In this particular case, we had four witnesses that would

2    testify that my client is not a danger to this community, that

3    she is not a violent person, that her character, I believe one

4    person described her as humble, that they have not seen her

5    behave in a violent manner, that they are not afraid of her,

6    that this is an individual that, when you would see her, she is

7    hardworking, that she works 14 hours a day.

8       With respect to risk of flight, this is an individual that

9    works with her family, that works and moves around for the

10    purpose of working, that she is here on a work visa.  And I know

11    that the Court may be very concerned about the fact that she is

12    not, in fact, a citizen, that when you look at the form, it

13    indicates that she has traveled back and forth from Mexico since

14    2014 on five occasions.

15       But Mr. Crane indicated that each travel was, in fact, legal

16    travel.  She receives a ten-month visa each year.  And this

17    coincides with the start of a new season and her receiving that

18    particular visa.  She is going to come into the country for the

19    purposes of working.  This is a highly regulated program that my

20    client is involved in and that she's participating in.

21       She does not have any criminal history.  And she's going to

22    do the things that she needs in order to be able to continue to

23    work in this particular program.  It's very difficult for an

24    individual to get into a program and to stay into this program.

25    They have a wait list for individuals that want to come to this

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 97 of 121   Document 11

May 24, 2019

1    country and work.  So my client is not going to do anything that

2    would jeopardize her ability to come into this country and

3    legally work in this country.

4        So even though this Court may be concerned about the fact

5    that she's not a citizen, I will say that she probably has the

6    most to lose of anybody if she did not abide by conditions that

7    this Court sets given, the fact that she's in a very highly,

8    sought-after program, if she were to, in fact, abscond or to do

9    something inappropriately while she was not on -- while she was,

10   in fact, on her bond.  Because at this point, she doesn't have a

11   detainer, and she is here in this country legally.  She is, in

12   fact, eligible to have a bond today.  And what I would submit is

13   that she, above anybody, has the most to lose.

14       And what we know of this individual is that she is a hard

15   worker and that we have Ms. Newberry, a person with her first

16   child, that says, I am willing to make her godmother, that if

17   something were to happen to me, I trust her with my child.  That

18   says a lot about an individual's character.

19       The only thing that my client wants to do is to simply work.

20   She wants to be able to provide for herself.  She's not trying

21   to run.  She's not trying to flee.  She wants to answer these

22   charges.  She wants to get this behind her.

23            THE COURT:  Let me ask you this, Ms. Williams.

24            MS. WILLIAMS:  Yes, sir.

25            THE COURT:  The Pretrial Services Report indicates

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 98 of 121   Document 11

1   she's living in a rented abode.  Do you know who she lives with

2   at that address on Sharon in Sparks, Georgia?

3       (Pause)

4           MS. WILLIAMS:  She lives with her brother Javier, which

5   kind of coincides with what we've heard today, which is this

6   entire operation is pretty much a family operation that we've

7   heard about.  And even when we heard from Brent Blozier, who

8   knows all of the Garcias, with Evergreen Produce, he indicated

9   that my client was a hard worker as well all of the other

10  Garcias were hard workers.  And I'm pretty sure that her brother

11  whom she lives with is also a hard worker.

12          THE COURT:  Do you know if he's a United States

13  citizen?

14      (Pause)

15          MS. WILLIAMS:  She indicates that her brother is, in

16  fact, a United States citizen.

17          THE COURT:  All right.  Anything further, Ms. Williams?

18          MS. WILLIAMS:  I would just submit that when you look

19  at the Pretrial Services Report, there are very few factors that

20  lean toward not giving my client a bond.  I mean, when they look

21  at danger, the only thing they list is this instant offense,

22  which, in all candor, it is a serious offense, I'm not going to

23  say that it's not, but we also know that when we're looking at

24  the various factors, what we should look at most heavily are the

25  other factors with this circumstance, which are the character of

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 99 of 121   Document 11

May 24, 2019

1    the individual.

2         And what we have here is an individual that does not have

3    any criminal history whatsoever.  We don't have any indication

4    that this person has any type of substance abuse history, all of

5    those other factors that we're normally so concerned about.  And

6    she does, in fact, have strong ties when we look at her various

7    family members that are, in fact, here in this particular

8    district.  I would submit that she should be given a bond.

9    Thank you.

10        THE COURT:  Thank you, Ms. Williams.

11        And Mr. Crane for the government.

12        MR. CRANE:  Yes, your Honor.  There are compelling

13   reasons why these defendants should be detained.  First of all,

14   Congress has made the initial and first decision that there is a

15   rebuttal presumption.  Therefore, we come into this proceeding

16   with that presumption that they should be detained.

17        None of the testimony we've heard today truly rebuts the

18   presumption.  And I will go through that in some detail.  But

19   the reasons that this statute is so serious and why Congress has

20   made, has made it subject to a rebuttal presumption, as are

21   other crimes of violence, child pornography, serious drug and

22   firearm offenses, is that it is simply, what counsel objects to,

23   modern day slavery.  Any way you look at it, it's simply

24   subjecting these people to involuntary servitude.  Forced labor,

25   involuntary servitude, document bondage, debt bondage, document

Case 2:19-cr-00096-PP   Filed 06/04/09  Page 100 of 121   Document 11

1    servitude.

2        We've heard wonderful, glowing reports how certain

3    individuals in the community would love for them to be, these

4    individuals to be their godmother or godfather, how they're

5    wonderful human beings.  However, they were not there in the

6    fields when individuals passed out in extreme weather and these

7    defendants would not allow them to have water, would not allow

8    them to take rest breaks.  So there's quite a divergence in the

9    testimony that is summarized first in the indictment, then in

10   the government's proffer, and then in the glowing testimonials

11   from the character witnesses.

12       And I won't go through each and every one, but we heard

13   wonderful, glowing testimonials.  But these individuals did not

14   go out in the fields.  They did not, none of them, none of the

15   testimonial witnesses went to Wisconsin and saw what was going

16   on there.  None of them saw the factory of hundreds and hundreds

17   of false green cards that Consuelo Garcia made.

18       We've heard from defense counsel, one thing that rings true,

19   this was a family business.  Indeed, it was.  The Garcia slavery

20   family business in Moultrie, Georgia.  And Consuelo Garcia was

21   the manufacturer of hundreds of false green cards.  The male

22   Garcias were the enforcers, as was Maria Garcia.

23       As to Maria Garcia, she is not a citizen, as the Court has

24   inquired recently to defense counsel.  Her situation is very,

25   very different.  She's not a citizen.  One, the Court can use

Case 2:19-cr-00096-PP   Filed 06/04/09   Page 401 of 121   Document 11

May 24, 2019

1    its own reason and judgment.  I will not prognosticate exactly

2    what her visa status will be when this matter is over, but it is

3    a fair assumption that her visa is not going to be renewed at

4    the conclusion of these proceedings regardless of the outcome.

5    She is going back to Mexico.

6        The question for her is does she sit around and wait to see

7    if she gets convicted of very serious forced labor charges and

8    then go back to Mexico, or does she simply go back now.  And

9    that is a calculation, I submit, that weighs heavily in the

10   government's favor, especially given that we benefit from the

11   presumption, the rebuttable presumption that she should be

12   retained in the first instance.

13       We heard many lovely testimonials that these are nice people

14   and that the character witnesses are not afraid of them.  The

15   victims are.  The people that were subjected to involuntary

16   servitude are afraid of them.  They are afraid of them

17   physically, and they are afraid that they would use their power,

18   their substantial power, using false documents, using debt

19   bondage, document servitude to send them back to Mexico, that

20   these are people, victims, that are so fragile that they would

21   rather work in quasi servitude as quasi slaves for these people

22   rather than go back to Mexico.  They are afraid of them.

23       The voices of the victims were not heard audibly in this

24   courtroom, yet they are heard in the pages of the proffer, and

25   they are heard in the indictment.  The victims are afraid of

1   them.

2       The character testimonials were that these people are law

3   abiding, they've never been in trouble with the law, and they

4   would respect the law.  No, they didn't.  It's a bald-faced lie.

5   They obstructed and perverted the investigation at every turn.

6   As recently as October 2018, just some six months ago, after

7   search warrants had been done, after documents had been seized,

8   after many of the migrant laborers had been interviewed, Saul

9   Garcia and Maria Remedios Garcia-Olalde, in Count 8, are

10  obstructing the investigation.  They are not law abiding.  As of

11  October, well into this investigation, they are not standing by

12  as lawful citizens, as law-abiding citizens who respect

13  authority.

14      So we have on one hand potential testimony which could rebut

15  the presumption from the witnesses that say they're law abiding.

16  No, they're not.  They are out there obstructing, committing

17  criminal obstruction, encouraging witnesses to lie and not

18  present accurate information to the grand jury in Wisconsin.

19  And that is as to Saul Garcia and Maria Remedios Garcia-Olalde.

20      The same in Count 9.  Saul Garcia is tampering.  He is not

21  willing to allow law enforcement and I would submit even the

22  Court to do its job and to let it run its court.  He's going to

23  go out there and shut the mouths of the witnesses, as they've

24  tried to do repeatedly --

25          THE COURT:  Now, let me ask you this, Mr. Crane.  I

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 103 of 121   Document 11
229-4059668-18

May 24, 2019

1  understand that the indictment contains allegations from 2018.

2  Does the government's proffer, document 23, does it include any

3  factual allegations from 2018?

4         MR. CRANE:  No.

5         THE COURT:  All right.

6         MR. CRANE:  However, I would note that the indictment

7  itself is evidence of probable cause and causes the rebuttable

8  presumption to be invoked.  And there's nothing that any of the

9  defense witnesses said -- not one single defense witness went to

10 Wisconsin and saw what was going on there.

11     There are other examples of witness tampering, transfer of

12 fraudulent documents, conspiracy to commit fraud throughout the

13 period of the conspiracy.

14     Therefore, the presumption has not been rebutted.  There is

15 virtually no way these people can run this business without

16 relying on this forced labor, peonage, slave labor.  Simply

17 returning them to the fields of Moultrie, Georgia, does not

18 answer the question.  They are engaged in what is inherently a

19 coercive, violent, criminal enterprise, and they are not able to

20 simply return to their community.

21     All of them have ties to Mexico, can simply slip over the

22 border in a heartbeat.  Why should any of them remain here to

23 face justice when they can slip over the border.

24     As to each and every one, the presumption has not been

25 rebutted, and therefore they should be retained pending trial.

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 104 of 121   Document 11

May 24, 2019

1   Thank you.

2          THE COURT:  Thank you, Mr. Crane.  All right.  And the

3   Court thanks all counsel for their presentations today.  And the

4   Court also thanks all the witnesses who have come, even the ones

5   that I did not hear from today.  Your lawyer made proffers as to

6   what you would say.  So the Court thanks all of you for being

7   here.  I know you're busy people and have things to do, but your

8   testimony is important for the Court to understand the issues

9   before it.

10         Now, I'm going to recess for 15 minutes, and I'll be back

11  with decisions as to all five defendants.

12         (Recess from 11:52 a.m. to 12:17 p.m.)

13         THE COURT:  All right.  Well, the Court, as is its

14  custom, will try to explain its decision or rationale for its

15  five decisions and the law that governs the Court.

16         Interested people and the parties have heard talk about a

17  rebuttable presumption and the Bail Reform Act.  So, first of

18  all, let me explain that.  The government starts the proceedings

19  today enjoying what's known as a rebuttable presumption.  It's a

20  law passed by Congress some time ago.  It says there are certain

21  charges that create a presumption that there are no conditions

22  this Court can set to reasonably assure the safety of the

23  community and to reasonably assure that the defendant will come

24  back to court.

25         So that presumption applies in this case because of the

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 105 of 121   Document 11

May 24, 2019

1   grand jury's indictment, where a grand jury found there was

2   probable cause for the charges that the government has

3   referenced here this morning.

4       Now, that presumption can be overcome.  It can be overcome

5   by some evidence going to those two things, danger to the

6   community and flight risk.

7       So the Court's first charge is to decide, has the rebuttable

8   presumption been overcome by evidence that the Court has heard

9   today either by proffer or from the witness stand or from the

10  pretrial services reports prepared by probation.  The Court

11  answers that question in the affirmative; that is, I do find the

12  rebuttable presumption has been overcome.

13      Now, just because it's been overcome, it's not the end of

14  the case because, as the government pointed out correctly, that

15  rebuttable presumption remains in the case.  In other words,

16  just because the defendants have overcome it doesn't mean I'm

17  not supposed to think about it anymore.  I am supposed to

18  consider the fact that the government had that rebuttable

19  presumption.  And it remains a factor for me to consider when I

20  go through the other parts of the Bail Reform Act that I am to

21  consider on the two questions, you remember, the danger to the

22  community and the flight risk.

23      So the lawyers are familiar with those factors the Court has

24  to consider.  You've heard talk about character.  Criminal

25  history is in there.  Weight of the evidence.  The nature and

 1  circumstances of the offense charged.  Whether anyone was on

 2  probation or parole at the time they were arrested or at the

 3  time of the charges.  The nature and seriousness of the danger

 4  to any person or the community that would be posed by the

 5  person's release.  Those are the factors the Court is to

 6  consider.

 7      So I have considered all those factors, and I have

 8  considered the fact the rebuttable presumption remains in the

 9  case.  Here is what is most important and has jumped out the

10  Court:  First of all, that all of the witnesses I have heard

11  from today, without exception, the Court finds were very

12  credible, very believable.  And I give great weight to what I've

13  heard from the witness stand today, the fact that the

14  defendants, several of them, have faced charges in the past and

15  they have shown up at the Court appearances.

16      The bottom line is, I don't consider any of these five

17  defendants a danger to the community.  That does not in any way,

18  shape, form, or fashion minimize the allegations brought in the

19  indictment.  That is dangerous conduct that is alleged, that the

20  government has emphasized today.  My finding is that I believe I

21  can set conditions that reasonably assure that that conduct, if

22  it took place at all, will not be repeated while they're on

23  pretrial release.  So I'm not concerned with the danger.

24      What I'm concerned about is the flight risk.  Obviously, all

25  five defendants have connections to a foreign country, in this

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 107 of 121   Document 11

1   case, Mexico.  They come and go regularly, as the government has

2   pointed out, some more so than others.  And one in particular is

3   not a United States citizen and is here on a work visa.

4       So my concern mainly is whether the government has carried

5   its burden.  And its burden is to show by a preponderance of the

6   evidence as to flight risk, a preponderance of the evidence that

7   there are no conditions this Court can set to reasonably assure

8   they'll come back to court.

9       Now, I was pointing out what was important to me, and I

10  mentioned the credibility of the witnesses, the fact that the

11  defendants who have faced charges in the past, including DUIs,

12  at least one defendant, there's no indication in their criminal

13  history that they fled to Mexico.  Instead, they stayed here, as

14  far as this Court knows.

15      It's been emphasized several times that the defendants were

16  aware of these -- of this investigation, I should say.  That's

17  contained in the government's proffer, and it's contained in the

18  indictment, that there are references back to 2016 of the

19  investigation as recently as 2018.  So there has been ample

20  opportunity for the defendants to flee and they have not.  And,

21  on top of that, they have gone to Mexico during that time that

22  the investigation's been ongoing, but each time they have come

23  back.

24      I also compared what the defendants stated to probation

25  about their travel history to Mexico with the exhibit tendered

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 108 of 121   Document 11

May 24, 2019

1   by the government.  And I found each of the five were

2   consistent; that is, that what they told probation matched up

3   with what the government had.  So, again, it makes the Court

4   feel better about the flight risk concern

5       Of course, the two youngest defendants have children on the

6   way and have had their significant others testify here this

7   morning and are expecting children in the near future, another

8   reason that they would stay here.

9       All of the defendants are gainfully employed.  The Court has

10  heard plenty of evidence about their work ethic, their loyalty,

11  their trustworthiness.

12      Finally, I note that the United States Probation Office,

13  after its investigation of each of these five defendants, has

14  recommended release with conditions.

15      So the Court is going to deny the government's motion that

16  these defendants be detained.

17      And so now that leaves us with the question of setting

18  appropriate conditions to reasonably assure that they come back

19  to court and they're not a danger.  So if I can get counsel and

20  the five defendants to approach the bench, we will go about that

21  business.  You don't have to worry about the order at this time

22  because I know the defendants at this point, and I know who

23  everybody is.

24      All right.  So what I'm going to do is I'm going to state

25  what the Court contemplates as to each of the five.  And then

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 109 of 121   Document 11

May 24, 2019

1    I'm going to give counsel an opportunity to respond and be

2    heard.

3         Now, as to the four United States citizens, the Court

4    contemplates basically standard conditions and unsecured bonds.

5    The only defendant, and it's nothing personal, you understand,

6    Ms. Garcia-Olalde, it's just you're in a different position than

7    the other four defendants because you are a Mexican national.

8    You're not a United States citizen.  There's not as much holding

9    you here.  Your residence is in Mexico, and you come here to

10   work.  And I understand that.

11        The Court is wrestling with some additional condition as to

12   you.  And that has been suggested by the U.S. Probation Office,

13   that I could require weekly personal contact between you and the

14   probation office.

15        And I guess that's where my thinking is now, Mr. Crane, but

16   I'll hear from the government.  I'll give you another chance

17   after I set the proposed conditions.  But does the government

18   want to be heard now as to where the Court is leaning as to

19   Ms. Garcia-Olalde?

20             MR. CRANE:  No.  The standard conditions provide her

21   passport and travel documents would be turned over to probation,

22   would be one of the standard conditions.

23             THE COURT:  Yes, sir.  Now, but that raises a question

24   that the Court doesn't know the answer to.  And I don't know if

25   probation has got me the answer yet.

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 110 of 121   Document 11

May 24, 2019

1      As I understand it, your client, Ms. Williams, Ms. Olalde,

2  Ms. Garcia-Olalde has a Mexican passport and a work visa.  Now,

3  of course we'll take the work visa -- I'm sorry.  We'll take the

4  Mexican passport.  The question I have is does the work visa

5  allow her to leave the country, or do you have to have a

6  passport to leave the country legally?  Does probation know the

7  answer to that?  You can go ahead and speak up for everybody

8  so --

9          UNIDENTIFIED FEMALE SPEAKER:  We were advised that you

10  have to have a passport and a visa both to get --

11          UNIDENTIFIED MALE SPEAKER:  That's right.

12          UNIDENTIFIED FEMALE SPEAKER:  -- (inaudible).  You have

13  to both a passport and visa (inaudible).

14          THE COURT:  All right.  Thank you.

15      All right.  So in that case, Mr. Crane, obviously, if I took

16  her work visa too she would be here illegally.  That's the only

17  thing that allows her to be here legally.  So my inclination

18  would be to take her passport, leave her with the visa, with my

19  understanding from probation that she couldn't legally leave the

20  country without both documents.  Do you have a contrary

21  understanding?

22          MR. CRANE:  Well, in my personal experience, the visas

23  I've gotten are a stamp which goes on your passport.  So it's

24  not possible necessarily to easily separate the same.

25          THE COURT:  All right.

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 113 of 121   Document 11

May 24, 2019

1          MR. CRANE:  There's quite a number of them.

2          THE COURT:  Gotcha.  Well, in that case, then, it may

3     be that we take the visa with the passport.

4          UNIDENTIFIED MALE SPEAKER:  It's apart.  They're not

5     together.

6          THE COURT:  All right.  Well, I'm going to leave

7     probation to work that out.  But I'll order it, as I understand

8     it, and we'll see where it takes us.

9          All right.  So what I'm going to do is set conditions as to

10    all five.  And then I'll hear from counsel as to any questions,

11    issues, or argument about those conditions.

12         First of all, Mr. Lawrence, as to the bonds, as to

13    Ms. Garcia-Olalde, if you will prepare a $25,000 unsecured bond.

14    As to the remaining defendants, they will each have a $15,000

15    unsecured bond.

16         So let me explain the significance of that.  The fact that

17    it's unsecured means the Court is not requiring any of you to

18    pay money into court today before you're released.  The

19    significance of the dollar amount is that should you fail to

20    appear in court when you're next required to or anytime that

21    you're required to or should you fail to abide by the conditions

22    this Court is going to set momentarily, you could forfeit the

23    amount of that bond, whether it's 15 or 25.  And the only reason

24    it is different as to Ms. Garcia-Olalde is because she is a

25    Mexican national, and the Court has different concerns regarding

May 24, 2019

1   flight risk as to her.

2       All right.  As to each of the defendants, there will be an

3   order setting conditions of your release.  Most of the

4   conditions are going to be the Court's standard conditions,

5   which will be the same to all of you.  They are different in a

6   couple of respects.  And where they are different, I will point

7   that out to you.

8       You will also, when we finish here, you'll meet with the

9   marshals, obviously, and they'll finish processing you.  You'll

10  also meet with a probation officer.  The probation officer will

11  give you a copy of this order so you'll have it.  But we're

12  going to go over it now in case anybody has any questions.

13      As to all of you, your release is subject to the following:

14  You must not violate any federal, state, or local law while on

15  release.  You must cooperate in the collection of a DNA sample

16  if authorized by federal law.  You must advise your supervising

17  officer in writing before any change of address or phone number.

18  You must appear in Court as required and if convicted, must

19  surrender as directed to serve any sentence which might

20  ultimately be imposed.

21      You'll be required to sign that unsecured bond that the

22  Court referred to earlier.  And of course one reason I'm giving

23  you an unsecured bond, which is your promise that you will come

24  back to court when your case is called, is because of all the

25  people standing behind you who have testified under oath about

May 24, 2019

1   your trustworthiness.  So because of that, the Court is going to

2   let you sign a piece of paper where you're promising the Court

3   that you'll come back and answer the charges when your case is

4   called.

5       Now, I don't know -- I expect your next appearance will be

6   in Wisconsin.  I don't know the date.  Your lawyers will notify

7   you of that.  But keep in mind it's your responsibility to know

8   when that Court date is in Wisconsin and to get yourself there

9   and make sure you're there on time and ready to see the judge.

10      All right.  Additional conditions.  You must each submit to

11  supervision by the U.S. Probation Office and report for that

12  supervision starting today.  Each of you is to continue or

13  actively seek employment with the exception of Daniel Garcia.

14  Since you are working on your master's, Mr. Garcia, I'm giving

15  you the option, you are to either continue or actively seek

16  employment or continue or start an education program.  Everyone

17  else, you are to continue or actively seek employment.

18      Each of you will be required to surrender any passport you

19  currently have to the probation office and obtain no new

20  passport or other international travel document while you're on

21  federal pretrial release.

22      Each of you, your travel will be restricted to the state of

23  Georgia and the state of Wisconsin for court appearances and

24  attorney visits.  In other words, in the state the Georgia, you

25  can go wherever you want to.  If you're going to Wisconsin, it's

Case 2:19-cr-00096-PP   Filed 06/04/09   Page 114 of 121   Document 11

May 24, 2019

1    only for court or to see a lawyer unless you obtain prior

2    approval to leave the state from the U.S. Probation Office.  So

3    if for some reason you've got a business or something in

4    Alabama, you'd check with the probation officer first and let

5    them know, and then if they approve it, you may go.

6              MR. COLLUM:  Your Honor?

7              THE COURT:  Yes, sir.

8              MR. COLLUM:  Does that affect, since there's five of

9    them and they may be traveling together, they may choose to

10   drive instead of fly.  Also, I'd add just the caveat that they

11   can travel through certain states to get to Wisconsin if need be

12   via a vehicle.

13             THE COURT:  Well, I'm just going to state here, to

14   me -- I see your point, Mr. Collum.  To me, that's common sense.

15   I think the government, probation, and the Court all understand

16   that when the Court says Georgia and Wisconsin, I know you've

17   got to get there.  So if you're traveling from Georgia to

18   Wisconsin, that will involve several other states.  And, yes,

19   the Court expects and allows you to do that.

20        All right.  As to all of you, you're not to possess a

21   firearm, destructive device, or other weapon.  Now, I know most

22   of you are working on farms or farming, where I'm sure probably

23   it's very common to have a shotgun or other weapon.  Snakes or

24   whatever.  Can't have them in the household where you are.

25   That's for probation's protection, your protection, everybody's

Case 2:19-cr-00096-PP   Filed 06/04/20   Page 115 of 121   Document 11

1 protection. If you have any weapons in the household, they need

2 to be given to someone else while you're on federal release.

3    As to all of you, you're not to use alcohol excessively, and

4 you're not to use or unlawfully possess a narcotic drug or other

5 controlled substance unless prescribed by a licensed medical

6 practitioner.

7    Now, as to Daniel Garcia and as to Saul Garcia, Jr., you

8 must submit to drug testing if required by your supervising

9 officer. And likewise, if directed by your supervising officer,

10 you are to participate in a program of inpatient or outpatient

11 substance abuse therapy and counseling. That's up to your

12 supervising officer. Just be aware that in the beginning and

13 sporadically the probation office will administer drug tests to

14 the two of you.

15    As to all of you, you are to report as soon as possible to

16 your supervising officer every contact you may have with law

17 enforcement, to include any arrests, questioning, or even a

18 traffic stop.

19    As to Ms. Garcia-Olalde, you are to have at least weekly

20 personal contact with the probation office.

21    All right, Mr. Crane, I'll start with you. Those are the

22 conditions the Court contemplates. Does the government request

23 to be heard on any of those conditions?

24        MR. CRANE: No, your Honor.

25        THE COURT: All right. Mr. Collum for Consuelo Garcia.

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 116 of 121   Document 11

May 24, 2019

1          MR. COLLUM:  No, your Honor.

2          THE COURT:  Mr. Cadle for Mr. Daniel Garcia, Saul

3     Garcia, Sr., and Saul Garcia, Jr.

4          MR. CADLE:  No, your Honor.

5          THE COURT:  And Ms. Williams for Ms. Garcia-Olalde.

6          MS. WILLIAMS:  No, your Honor.

7          THE COURT:  As to each of you, those are the only

8     conditions.  And, remember, probation will give you a copy of

9     this.  But I do need to tell each of you that while you're on

10    federal release, should you commit a federal felony, the

11    punishment is an additional prison term of not more than ten

12    years.  If you commit a federal misdemeanor while on release,

13    the punishment is an additional prison term of not more than one

14    year.

15         Those sentences would be consecutive to any other sentence

16    you receive.  In other words, you're going to be on federal

17    release until this Wisconsin case is dealt with.  While you're

18    on federal release, if you commit a federal offense, in addition

19    to worrying about the penalty on the new federal offense,

20    there's a penalty on top of it because you're on federal release

21    at the time.

22         Lastly, I need to tell each of you that it is a crime

23    punishable by up to ten years in prison and a $250,000 fine or

24    both to obstruct a criminal investigation, tamper with a

25    witness, victim, or informant, retaliate or attempt to

Case 2:19-cr-00096-PP   Filed 06/04/20   Page 117 of 121   Document 11

May 24, 2019

1  retaliate, intimidate or attempt to intimidate a witness,

2  victim, juror, informant, or officer of the court.

3      Each defendant is ordered released after processing.

4      So you're each going to be handed two documents to sign.

5  One is the bond that I referred to.  And the second is this

6  three-page release order that I just read.  You'll need to sign

7  each of those two documents.  And my courtroom deputy may ask

8  you for some contact information as well.

9      All right.  Mr. Lawrence?  I'm not going to try to put them

10  in order.  I'll let you do that.

11      Mr. Howell, were you able to verify the information the

12  Court asked you about?

13          MR. HOWELL:  Yes, sir.  (Inaudible)

14      (Inaudible discussion)

15          THE COURT:  All right.  Here's the salient point.  Can

16  she leave the country legally with just the visa?

17          MR. HOWELL:  No, sir.

18          THE COURT:  All right.

19          MR. HOWELL:  She would have to have a passport, and we

20  will have to obtain her passport.

21          THE COURT:  And, Ms. Garcia-Olalde, so there's no

22  confusion between you and me, you are not allowed to leave the

23  United States while these charges are pending.

24          THE INTERPRETER:  That's fine.

25          THE COURT:  The Court is releasing you today with your

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 118 of 121   Document 11

May 24, 2019

1  understanding you will stay in this country and deal with these

2  charges.  Do you understand?

3           THE INTERPRETER:  Yes.

4           THE COURT:  All right.  The Court's satisfied.

5      Mr. Lawrence, I've got those ready for you.

6      (Discussion off the record)

7           THE COURT:  All right, Mr. Crane, is there anything

8  further as to any of these five defendants on behalf of the

9  government today?

10          MR. CRANE:  No, your Honor.

11          THE COURT:  Mr. Cadle on behalf of the three Garcias

12  you're representing.

13          MR. CADLE:  No, your Honor.

14          THE COURT:  Mr. Collum for Consuelo Garcia.

15          MR. COLLUM:  No, your Honor.

16          THE COURT:  Ms. Williams for Ms. Garcia-Olalde.

17          MS. WILLIAMS:  No, your Honor.

18          THE COURT:  Now, before we adjourn, hopefully, if you

19  follow the order and there are no problems, you won't be back in

20  this court or see me unless there's a Rule 20 transfer.  When

21  you go to Wisconsin, you will appear in front of another

22  magistrate than myself who will most likely review the release

23  order that I have entered today.

24      There's a possibility there will be a new prosecutor up

25  there.  You may have the same lawyer, different lawyer.  It

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 119 of 121   Document 11

May 24, 2019

1   could be that the judge up there decides to make some changes to

2   the conditions that I have set.  Just be aware of that.  Not

3   something to worry about today, but he'll review or she will

4   review what I've done today.

5        All right.  Good luck to each of you.  You'll see probation

6   and the marshals and you'll be free to go.  All right.  We're

7   adjourned.

8        (Concludes at 12:46 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:19-cr-00096-PP   Filed 06/04/19   Page 120 of 121   Document 11

May 24, 2019

CERTIFICATE


           I HEREBY CERTIFY THAT THE

FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT FROM THE AUDIO

RECORDING OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER TO THE

BEST OF MY ABILITY.


/S/ Mindy Martin                              June 3, 2019
MINDY MARTIN, RMR, FCRR
UNITED STATES COURT REPORTER
201 West Broad Avenue
Albany, Georgia  31701
Phone:  229-405-6818